**DEL LABORATORIES, INC., Plaintiff,**

**v.**

**ALLEGHANY PHARMACAL CORP., Defendant.**

**No. 80 Civ. 2719.**

United States District Court,
S. D. New York.

June 26, 1981.

---

Hamel, Park, McCabe & Saunders, Washington, D. C., for plaintiff; Raymond D. McMurray, Peter S. Reichertz, Washington, D. C., William J. Condon, New York City, of counsel.

Friend, Perles & Dorfman, New York City, for defendant; Jerold W. Dorfman, Frank Decolvenaere, New York City, of counsel.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

Plaintiff Del Laboratories, Inc. ("Del") distributes a line of skin care products under the trademark REJUVIA. Del commenced this action against defendant Alleghany Pharmacal Corp. ("Alleghany") alleging both trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* and unfair competition as a result of Alleghany's use of the trademark REJUVA–NAIL on a nail repair kit. The court held a combined hearing on plaintiff's application for preliminary and permanent relief. Following are the court's findings of fact and conclusions of law, together with its reasons for holding that Alleghany's use of REJUVA–NAIL for a nail repair product does not infringe plaintiff's REJUVIA mark.

Del is a manufacturer of various drug and cosmetic products. It acquired the RE-JUVIA mark, originally registered in 1931, in 1967. After 1967 and through the early 1970's, the name REJUVIA appeared on several Del products, including nail polish, as a designation of a division of Del rather than as a trademark, in conjunction with another Del trademark "Flame-Glo". In 1972, Del separated the REJUVIA and Flame-Glo divisions, continuing to distribute certain products, although not nail polish, under the Flame-Glo mark.

At approximately the same time, Del introduced a line of skin care products, intended to appeal to women over thirty, under the REJUVIA mark. Six products currently bear the REJUVIA MARK: Vitamin E Hand and Body Lotion, Vitamin E

Skin Beauty Creme, Vitamin E Skin Beauty Oil, Vitamin E Penetrating Moisture Formula, Peel-Off Mask and Musk Oil. Total gross sales for these products between 1975 and the first quarter of 1980 were nearly $3,000,000 with a high of $800,000 in 1976, a low of $355,000 in 1979, and approximately $425,000 in the two intervening years. During that same period, plaintiff expended approximately $150,000 in co-op advertising, its primary advertising form.

In the past two years plaintiff has spent a very small portion of its advertising dollar on Musk Oil and Peel-Off Mask, and sales of these two products account for a comparatively minor percentage of total sales. Thus, it can be fairly stated that the REJUVIA trademark is primarily used in conjunction with the Vitamin E skin care products. These products appear together in ads and promotional literature and are sometimes designated as the REJUVIA Vitamin E Skin Beauty Care Collection. Del's 1979 Annual Report illustrates the four products together with the following description: "The Rejuvia trademark is applied to a selective group of skin care products formulated with Vitamin E." The Rejuvia line is sold through both chain and independent drug stores and discount stores.

Del also distributes a complete line of hand and nail care products under the "Sally Hansen" trademark. Although sales figures were not produced, the 1979 report describes the Sally Hansen brand as a leader in its field, nationally advertised through television commercials and prominent women's publications. One of the Sally Hansen products is "Mend-a-Nail", described as a nail mending kit. Del's product research division is currently developing new hair products to be distributed through its Rejuvia division.

Defendant Alleghany distributes over-the-counter drugs, cosmetics and other consumer household products. In 1979 its net sales exceeded $12,000,000 and it spent $4,000,000 in advertising. The Larry Mathews division of Alleghany, responsible for developing new cosmetic products, conceived the idea of a nail repair product in 1979. It selected the name REJUVA–NAIL because it conveyed the impression of renewing a nail. A patent application submitted in February, 1980 was still pending at the time of the hearing.

The REJUVA–NAIL package contains a nail buffer, simulated nails in various sizes and an adhesive containing the ingredient alpha cyanoacrylate. This adhesive is popularly known as "Krazy Glue". The adhesive is intended to bond the simulated nail to the natural nail. The adhesive can also bond skin, a fact which is not revealed on the REJUVA–NAIL package, but is stated on the directions inside the package and on the glue tube itself. In the event that skin bonding occurs, the directions rather obliquely suggest that the user apply nail polish remover immediately. Persons with bonded skin may be treated by a physician who can effectively apply the same treatment within a few hours. Attempts to separate skin without application of polish remover may result in torn skin.

Promotion of REJUVA–NAIL was commenced in 1979 and orders were shipped in January 1980. During the first five months of 1980 sales totalled approximately $145,000 to $150,000. Alleghany spent $50,000 in advertising from the product's inception, and at the time of trial was committed to spend $50,000 to $100,000 more. REJUVA–NAIL is distributed through the same outlets as are plaintiff's products.

Plaintiff introduced the results of a survey of 300 women conducted on plaintiff's behalf at three suburban shopping malls in the metropolitan New York area. The respondents, selected randomly as long as they were at least 18 years of age and used or purchased cosmetics, were shown five products, among them REJUVA–NAIL and REJUVIA Penetrating Moisture Formula and three unrelated products, and were asked to select which, if any, were made by the same manufacturer. 38% of the respondents selected the plaintiff's and defendant's products, along with at least one other; 28% selected only the two products at issue.

## Discussion

The issue in a trademark infringement case is " 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.' " *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979) (hereinafter "McGregor"), *quoting Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). When the products are different, as in the instant case, the court is guided by the following factors in determining whether the senior user is entitled to relief:

> The strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Polaroid Corp. v. Polorad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *accord, McGregor, supra*, 599 F.2d at 1130. The court will discuss each of the factors *seriatim*.

### 1) Strength of Mark

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *McGregor, supra*, 599 F.2d at 1131. It is useful in assessing the relative strength of a mark to consider the four categories under which terms are classified for trademark purposes: 1) gener-

ic, 2) descriptive, 3) suggestive, and 4) arbitrary. *Id.* The classification becomes significant in assessing the plaintiff's burden on this prong of the *Polaroid* test, because a mark which is merely descriptive is considered to be "weak" and cannot be accorded trademark protection without proof of secondary meaning whereas a mark which is either suggestive or arbitrary is strong and presumptively valid.[1] *Id.; see also Mushroom Makers, Inc., supra*, 580 F.2d at 48. A term is descriptive if it conveys the purpose or function of a product, *see, e. g., W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970) ("trim" for nail scissors is weak mark descriptive of product's function), or if it "conveys the characteristics, functions, qualities or ingredients of a product to one who has never seen it and does not know what it is." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 487 (S.D.N.Y.1968) (footnote omitted). In contrast, a suggestive term is one which "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Id.* at 488. While REJUVIA would certainly invoke a product with qualities designed to improve or renew that to which it is applied, one could not conclude that the product was intended to be used for skin care or improvement. It is also significant that REJUVIA is not a word in our vocabulary, since the principal reason that words classified as descriptive are denied trademark protection is to insure that words commonly used to describe products or services should not be unduly limited. *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 498 (2d Cir. 1962). In addition, the decision of the Patent and Trademark office to register the mark without proof of secondary meaning creates a presumption that the mark is more than merely descriptive. *McGregor, supra*, 599 F.2d at 1132. For these reasons, the court finds that REJUVIA is a suggestive mark. Thus, it is entitled to trademark protection.

---

[1] "A generic term is one that refers, or has come to be understood as referring to the genus of which the particular product is a species . . . [N]either at common law nor under the Lanham Act could generic terms become valid trademarks, since the first user cannot deprive manufacturers of the product of the right to call an article by its name." *Reese Publishing Co., Inc. v. Hampston Intern. Communications, Inc.*, 620 F.2d 7, 10 (2d Cir. 1980).

Classifying the mark as suggestive does not end the court's inquiry on the question of the strength of the REJUVIA mark. Although *McGregor* instructs that it is error to *require* plaintiff to prove secondary meaning once it has established that a mark is at least suggestive, it is not error for the court to consider all evidence which may bear on the "origin-indicating significance of a mark in the marketplace." *McGregor, supra,* 599 F.2d at 1132.

As recently defined by the Second Circuit:

The doctrine of secondary meaning requires not only that the mark have a subordinate meaning, but also that the *primary* significance of the mark in the minds of the consumers is the identification of the producer, not a designation of the product.... The crucial question ... always is whether the public is moved in any degree to buy the article because of its source.... Each case must ... be decided on its facts with consideration given to such elements as the length and exclusivity of use, sales levels and extent of advertising and promotion.

*American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

Plaintiff argues that the advertising and sales figures support a finding that the mark has acquired secondary meaning. The court declines to attach any particular significance to the five-year advertising expenditure of $150,000 for co-op advertising. Without implying a judgment on the benefits of co-op advertising, the court merely observes that when many products share space on a newspaper page it is unlikely that a strong image is created for any one product. Plaintiff's sales, although signifying some success, are not "meteoric." *Cf. Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1224, *aff'd,* 580 F.2d 44 (2d Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (sales increased from $16,200 to $8,000,000 within two years); *see also Avon Shoe Co. v. David*

*Crystal, Inc.,* 279 F.2d 607, 610 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). The court is skeptical of plaintiff's claim of the products' acceptance as leaders in the field in light of the declining sales figures from 1975–1979. Nor did plaintiff introduce any other indicia of secondary meaning. *Cf., e. g., Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1173 (2d Cir. 1967) (magazine articles, sales figures, advertising expenditures); *Maternally Yours v. Your Maternity Shop,* 234 F.2d 538, 541 (2d Cir. 1956) (additional stores opened); *Safeway Stores, Inc. v. Safeway Properties, Inc., supra,* 307 F.2d at 499 (judicial notice of identity of "Safeway" mark with supermarket).

The court notes further that REJUVIA was submerged in the Flame-Glo mark until 1972 and has been used as a trademark in connection with plaintiff's products for a relatively short time. Although the court does not consider the lack of secondary meaning as "belying the strength of (plaintiff's) mark," *see Mushroom Makers v. R.G. Barry Corp., supra,* 580 F.2d at 48, the court nonetheless recognizes that "[t]rademark strength is an 'amorphous concept with little shape or substance when divorced from the mark's commercial context.'" *McGregor, supra,* 599 F.2d at 1133.

Defendant argues that the plethora of thirty party registrations using similar marks for similar products detracts from the strength of plaintiff's mark. In *Triumph Hosiery Mills, Inc. v. Triumph Intern. Corp.,* 308 F.2d 196, 199 n.2 (2d Cir. 1962), the court pronounced the mark "Triumph" a "weak" mark because of the hundreds of registrations of the mark and other appearances of the corporate name. *See also Sterling Drug, Inc. v. M–A Pharmaceutical Corp.,* 343 F.2d 1016, 1017 (C.C.P.A.1965). The Second Circuit though, has subsequently stated that the "significance of third-party trademarks depends wholly upon their usage." *Scarves by Vera, Inc. v. Todo Imports, Ltd., supra,* 544 F.2d at 1173. The Court rejected evidence of third party registrations since the defendant failed to adduce evidence of the existence of the prod-

ucts in the marketplace or the continued viability of the registrations. Distinguishing the case from *Triumph Hosiery Mills, supra,* the Court observed that only one of the third party registrations was for precisely the same mark and several of the products were totally unrelated.

Returning to the instant case, among the sixteen third party registrations introduced by Alleghany, some of which have expired, there were nine for skin products, five for hair products and two for home furnishings. The marks ranged in varying degrees of similarity to plaintiff's. Mindful of the proscription of the Second Circuit in *Scarves by Vera, supra,* 544 F.2d at 1173, the court does not alter its assessment of the strength of plaintiff's mark as a result of these registrations; nonetheless, the court must be aware in reaching determination on the ultimate question here—likelihood of confusion—that the Patent and Trademark Office did not exercise its discretion pursuant to 15 U.S.C. § 1052(d) and decline to register these marks as "likely to cause confusion" despite similar existing registrations.

### 2) *Similarity Between Marks*

The Second Circuit recently stated that "even close similarity between two marks is not dispositive of the issue of likelihood of confusion." *McGregor, supra,* 599 F.2d at 1133. The important consideration is the likely effect of the marks upon prospective customers. *Id.*

As a threshold matter, the court cannot agree with plaintiffs that the marks are "virtually identical." Plaintiff argues that the court should disregard the descriptive term "nail"; however, the Court in *McGregor* specifically instructed the district court to consider the general impression conveyed by the two marks because "the law does not require that trademarks be carefully analyzed and dissected by the purchasing public." *McGregor, supra,* 599 F.2d at 1134.

There have indeed been recent cases where there could be no disagreement about the identity of marks, *see, e. g., McGregor, supra* (Drizzler and Drizzle); *Mushroom Makers, Inc. v. R.G. Barry Corp., supra,* (Mushroom and Mushrooms), but the

two marks at issue here do not support such an observation, even before considering their different methods of presentation. REJUVIA appears on the four main products in red, stylized slanted printing, with a distinctive letter "j" and "v"; whereas RE-JUVA–NAIL is in white block letters. *See Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons,* 523 F.2d 1331, 1339 (2d Cir. 1975) (different type styles distinguish marks visually). The REJUVIA products are also characterized by a prominent "VIT-AMIN E" symbol which due to its size virtually dominates the REJUVIA mark. Plaintiff's four products are displayed and sold in white or clear bottles or jars without boxes. REJUVA–NAIL is sold in a black box which portrays a woman's hand and long red fingernails as well as a picture of the purported results of using the product. The REJUVA–NAIL package also recites that it is "new from Nutra-Nail." Thus, although the names have some aural resemblance as a result of the initial letters, there is total visual dissimilarity between the marks on the products as they appear to consumers. *See Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, 22 (N.D.Ill.1964), *aff'd,* 353 F.2d 641 (7th Cir. 1965) ("when products are sold in self-service markets, then the visual impression of the trademark, as well as the sound of the words, is important.")

The court concludes that defendant's mark, as presented to the consumer, differs considerably from plaintiff's.

### 3) *Proximity of Products*

Plaintiff concedes that the relevant inquiry for non-competing goods is whether a consumer would be likely to purchase defendant's product in the belief that plaintiff's company is the *source* of that product. 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 82.2 at 805 (3d ed. 1969) [hereinafter Callman]. *McGregor, supra,* 599 F.2d at 1135. Among the relevant factors are:

> The physical attributes or essential characteristics of the goods, with specific reference to their form, composition, texture or quality, the service or function for

which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold, or the class of customers for whom they are designed and to whom they are sold. Callman § 82.2(c) at 807.

The products here admittedly serve different functions. They are distributed through similar outlets, although probably sold in different departments. There is no evidence of the class of customers to which either skin cream or nail repair kits might appeal. In *Avon Shoe Co. v. David Crystal, supra,* 279 F.2d at 612, where the marks were identical, the court was influenced by the fact that designers often produce different articles of women's apparel under the same mark, and that women consumers, aware of high fashion labels, are likely to rely on such labels to identify a product's source. In *Scarves by Vera, Inc. v. Todo Imports, supra,* 544 F.2d at 1164, a significant factor in the court's decision was that leading clothing designers frequently distribute perfumes and cosmetics under their successful trademarks. This court has no evidence before it of the overlap between skin care and nail repair products, nor of their appeal to the same category of consumers. Although plaintiff's products were designed to reach women over 30, there is no evidence of the age group to which defendant's product is directed. One factor which militates in plaintiff's favor, is that both companies use co-op advertising and it is conceivable, although not demonstrated, that a REJUVIA product could appear on a page next to defendant's product. Weighing all these factors the court is nonetheless persuaded that because of distinction in the nature and purpose between plaintiff's and defendant's products there is competitive distance between them.

### 4) *Bridging the Gap*

Mr. William McMenemy, one of plaintiff's officers, testified that Del intended to expand its product line under the REJUVIA mark. His testimony was substantiated by documentary evidence demonstrating the plans and development of new hair care products. Nevertheless, the court is not convinced that there is any real possibility that the REJUVIA mark will be used on nail products. Plaintiff currently markets an extensive nail care line under the Sally Hansen mark, including a nail repair kit, and while this would not preclude plaintiff from introducing competing products under another division, in the absence of any concrete evidence of such intent, the court finds plaintiff has failed to meet its burden on this factor.

### 5) *Actual Confusion*

It is well settled that a plaintiff need not prove actual confusion in order to establish likelihood of confusion. *McGregor, supra,* 599 F.2d at 1136. Plaintiff adduced no evidence of actual confusion, arguing that the products are too new for such incidents to have occurred or to have been reported. It did, however, introduce the survey conducted by R.L. Associates, under the direction of Dr. Michael A. Rappeport, as evidence on this point. Both Dr. Rappeport and defendant's expert, Dr. Stanley Reiss, testified as to their respective assessments of the survey's validity. The court found both witnesses credible but attributes minimal weight to the survey as a predictor of consumer confusion. The three hundred respondent women were selected on the basis of their age (over 18) and the fact that they either used or purchased cosmetics. The most serious flaw in selecting respondents randomly in this manner is that the women were not necessarily potential purchasers of either product. In *American Luggage Works, Inc. v. United States Trunk Co.,* 158 F.Supp. 50, 53 (D.Mass.1957), *aff'd sub nom. Hawley Products Co. v. United States Trunk Co.,* 259 F.2d 69 (1st Cir. 1958), the court stated:

[U]nder the substantive law the issue is not whether the goods would be confused by a casual observer ... but the issue is whether the goods would be compared by a prospective purchaser at the time he considered making the purchase. If the interviewee is not in a buying mood but is just in a friendly mood answering a pollster, his degree of attention is quite different from what it would be had he his

wallet in hand. Many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash. *Accord, American Footwear Corp. v. General Footwear, supra,* 609 F.2d at 661 n.3; *Cf. Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons, supra,* 523 F.2d at 1340 (one survey based on interviews with actual purchasers of pianos at issue, in second survey potential piano purchasers interviewed).

Another valid criticism raised by defendant is that the products were viewed lying on a table, unlike their position under usual selling conditions, and respondents were not permitted to touch the samples. Further, although the top flap of the REJUVA—NAIL package identifies NUTRA—NAIL as its source, neither the survey supervisors nor interviewers could assure that the flap was visible to respondents.

### 6) *Good Faith*

There is no evidence that defendant adopted its mark with the intention of capitalizing on plaintiff's reputation. *McGregor, supra,* 599 F.2d at 1137; *see also Triumph Hosiery Mills, Inc. v. Triumph Internat'l Corp., supra,* 308 F.2d at 199. The uncontroverted testimony of defendant's witness, Mr. Larry Mathews, is that the name was selected because it conveyed the product's purpose and would fit well on the package. The witness also testified that although he had been in the beauty supply business for twenty-five years, he had never heard of plaintiff's product or mark. This testimony is credible in light of the mark's dormancy until 1972 and its relatively modest reincarnation with plaintiff's skin care products. Defendant has succeeded in rebutting any presumption of its intent to profit from plaintiff's reputation.

### 7) *Quality of Defendant's Product*

■ One of the interests protected by the trademark laws is that of the senior user in "the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise." *Scarves by Vera, Inc. v. Todo Imports, Ltd., supra,* 544 F.2d at 1172. When there is no evidence that a junior user is selling inferior merchandise or engaging in disreputable trade practices, this concern may be dismissed summarily. *See Mushroom Makers, Inc. v. R.C. Barry Corp., supra,* 580 F.2d at 49. Here, though, plaintiff has made some showing that careless application or misuse of defendant's product might lead to injuries. After careful consideration of plaintiff's concern, the court finds the possibility of threat to plaintiff's reputation too remote to require enjoining defendant's use of its mark. The cumulative effect of the court's findings is that the products bearing the respective marks are sufficiently dissimilar so as to dispel any likelihood of consumer confusion. That being the case, an injured person would hardly be likely to associate plaintiff's name with defendant's product. Also, while there was testimony about potential for injury, there was no documentation of actual injury suffered by any user. Thus, it would appear that plaintiff's fear that its reputation would be in jeopardy is merely speculative.

### 8) *Sophistication of Buyers*

The touchstone for determining the level of sophistication of the relevant purchaser is:

> The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods . . . .

*McGregor, supra,* 599 F.2d at 1137 (citation omitted). The difficulty in applying that standard to the instant controversy is in judging how much care and thought women devote to purchases of the class of items represented by both products. Usually the price is a helpful guideline:

> The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacture or source than will the average purchaser of a ball of twine.

*McGregor, supra*, 599 F.2d at 1137. Thus, it may be assumed that since the price of these items is relatively low, and they are sold in outlets where rapid purchases are made, consumers would give them only cursory inspection prior to purchase. On the other hand, defendant's product is not a common cosmetic item, a fact which is readily apparent from the illustrations on the box. The REJUVA–NAIL package invites close inspection because it contains graphic "before and after" illustrations as well as illustrated directions for use. It is not unreasonable to conclude that potential customers would exercise more care than ordinarily given to a common inexpensive cosmetic item before purchase. The likelihood of confusion is thus minimal.

### Conclusion

Based on the preceding discussion, the court finds that plaintiff has failed to demonstrate that defendant's use of the REJUVA–NAIL mark on its nail repair kit is likely to cause consumer confusion with plaintiff's REJUVIA products. In balancing the comparative interests of the parties, *see McGregor, supra*, 599 F.2d at 1140, the court is mindful of defendant's recent entry into the field and of the relatively small investment made to date in establishing its product. Nevertheless, requiring defendant to adopt a new mark will result in loss of any good will acquired. Plaintiff is so unlikely to be affected in any way by defendant's use of the REJUVIA–NAIL mark that the balance of equities tips in defendant's favor.

As stated by Judge Learned Hand:
Although there appears to be a persistent belief that the first use of a specific name or description gives a power to the first user to prevent its use by others, it is important to remember that no such doctrine exists. In all such cases there is

only one question: what damage to the first user will the second do by the use of the first user's mark, or name or makeup, and what burden will it impose upon the second user effectively to distinguish the goods?

*Federal Telephone & Radio Corp. v. Federal Television Corp.*, 180 F.2d 250, 251 (2d Cir. 1950), approved in *Mushroom Makers, Inc. v. R.G. Barry, supra*, 580 F.2d at 48.

The standards applicable to the trademark infringement claim also control the claim of unfair competition. *See Mushroom Makers, Inc. v. R.G. Barry, supra*, 441 F.Supp. at 1234. Accordingly, the complaint is dismissed.[2]

So Ordered.

---

**2.** Defendant raised, for the first time in post-trial briefs, issues concerning plaintiff's good faith both in connection with defendant's discovery demands prior to trial as well as in connection with plaintiff's Patent Office filings. Plaintiff, in reply, denied these allegations and asserted that its failure to produce certain documents, as well as any error in its submissions to the patent office, were the result of error rather than intent to defraud. The court declines to resolve these disputed factual issues on the basis of post-trial argument, submitted after the close of the record in this case.