**NARWOOD PRODUCTIONS, INC., Plaintiff,**

v.

**LEXINGTON BROADCAST SERVICES COMPANY, INC., Defendant.**

No. 82 Civ. 1126 (GLG).

United States District Court, S. D. New York.

June 18, 1982.

Blum, Kaplan, Friedman, Silberman & Beran, New York City, for plaintiff; James K. Silberman, Steven H. Hartman, New York City, of counsel.

Battle, Fowler, Jaffin & Kheel, New York City, for defendant; Raphael G. Scobey, David Fleischer, W. Bruce Johnson, New York City, of counsel.

### OPINION

GOETTEL, District Judge.

Narwood Productions, Inc. (Narwood) commenced this action against Lexington Broadcast Services Company, Inc. (LBS), alleging violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1976), and New York's common law of unfair competition. Before this Court is Narwood's motion for a preliminary injunction.

For the past twenty-five years, Narwood has been in the business of producing and syndicating radio programs. Its most recent endeavor is "The Music Makers," a series of weekly one-hour radio programs featuring the music of entertainers popular with "adult listening" and "middle of the road" audiences.[1] Developed in 1981, this series commenced with a national broadcast on January 4, 1982. At present, the pro-

gram is broadcast weekly by 160 radio stations and has a weekly audience of approximately 3,600,000 listeners.

LBS is in the business of packaging and distributing television programs to broadcast television stations and cable television systems. In 1981, it decided to develop a series of monthly television programs featuring one musical entertainer in a concert type setting. Coincidentally, it too chose "Music Makers" as the title of its series. The first program of this series was broadcast in April 1982, and presumably, a new program will be broadcast during each subsequent month.

Neither LBS nor Narwood was aware of each other's programs until early 1982. Upon learning of LBS's project, Narwood's counsel immediately informed LBS that use of the term "Music Makers" would violate Narwood's exclusive common law trademark rights. Thereafter, counsel for both parties discussed the problem, and LBS, although taking the position that Narwood could not claim exclusivity in the term "Music Makers," agreed to change the name of its series to "LBS's Music Makers in Concert." Unsatisfied, Narwood instituted this action and brought this motion.

*Discussion*

Before a preliminary injunction may be granted, Narwood must show "possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 54 (2d Cir. 1979) (quoting *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610 (2d Cir. 1978)). This it has not done. Even if it is assumed that irreparable injury will befall Narwood absent a preliminary injunction (and this is clearly a debatable

---

1. Put precisely, "[a]s developed and currently produced, each program is a 'special,' devoted to playing the music of and an interview with a well known musical entertainer popular with 'adult listening' and MOR (middle of the road) audiences." Levan Affidavit ¶ 3. Examples of entertainers who have been featured or will be featured include Rosemary Clooney, Vic Damone, and Benny Goodman.

point), it has not convinced this Court that ultimate success on the merits is probable, and it has not even argued that there are serious questions going to the merits coupled with a balance of hardships tipping decidedly in its favor.[2]

Narwood's success in this lawsuit depends upon whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods [or services] in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).[3] This in turn depends upon factors such as "the strength of the [senior user's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the [senior user] will bridge the gap, actual confusion, . . . and the sophistication of the buyers." *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Moreover, the likelihood of confusion analysis must be supplemented by equitable considerations, *see Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 924 (S.D. N.Y.1981), such as the junior user's intent in adopting its own mark, the quality of the junior user's product, and once again, the likelihood that the senior user will bridge the gap. *Polaroid Corp. v. Polarad Electronics Corp., supra*, 287 F.2d at 495. *See generally Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir. 1981); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979); *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 580 F.2d at 47. An evaluation of these factors in the present case indicates that Narwood's chances of prevailing are not great, and they certainly do not justify the issuance of a preliminary injunction.

1) *Strength of the Mark*

Trademark strength or distinctiveness refers to the tendency of a trademark "to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1131. Determination of trademark strength is perhaps the most important factor in the likelihood of confusion analysis because the amount of protection accorded a particular trademark depends upon its strength—the stronger the mark, the greater the protection. *Id.* at 1131; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

For purposes of determining trademark strength, there are four categories of marks: generic, descriptive, suggestive, and arbitrary or fanciful. *Id.* at 9. A generic term "is the name of a particular genus or class of things or a member of such a class. . . . [I]t answers the questions 'What is it?' or 'What do you call it?'" 1 J. Gilson, Trademark Protection and Practice § 2.02, at 2–8 to –8.1 (1979). Because a generic term, by definition, identifies a product to the public, it cannot function as a trademark by identifying the source of goods or services and distinguishing them from others. Hence, the law accords no trademark protection to a generic term. *See McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1131; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 9. *See generally Comment, Section 14 of the Lanham Act—FTC Authority to Challenge Generic Trademarks*, 48 Fordham L.Rev. 437, 442–46 (1980). A descriptive term "conveys the characteristics, functions, qualities or ingredients of a product to one who has never seen it and does not know what it is." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 487 (S.D.N.Y.1968) (foot-

---

**2.** Even if it had made such an argument, however, it is unlikely that our conclusion concerning the propriety of issuing preliminary relief would be altered.

**3.** Narwood must also show that, as between it and LBS, it is the senior user of the mark—a point sharply disputed by LBS. For the purposes of this motion, however, it will be assumed that Narwood is the senior user.

note omitted); *see* 1 J. Gilson, *supra*, § 2.02, at 2–8.1. A descriptive term can become a legally protected trademark only if it attains secondary meaning, *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1131, that is, if "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). A suggestive term falls between a descriptive term and an arbitrary or fanciful term. Unlike a descriptive term, which "conveys an immediate idea of the ... characteristics of the goods," a suggestive term "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers, Inc., supra,* 295 F.Supp. at 488. It is entitled to protection as a trademark without evidence of secondary meaning. *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1131; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11. An arbitrary or fanciful term is neither generic, descriptive, nor suggestive. An arbitrary or fanciful term used as a trademark possesses the greatest distinctiveness and is afforded the greatest degree of trademark protection. *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1131; *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9, 11.

"The Music Makers" falls within the middle range of distinctiveness. In other words, an argument can be made for characterizing the term as either descriptive or suggestive.[4] On the one hand, contrary to Narwood's assertion that the term gives "no clue" about the program, "The Music Makers" is arguably descriptive of the general musical nature of the program and the type of performer featured on it. This is especially true since radio programs are more often than not of a musical nature. *Cf. Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9 ("a term that is in one category for a particular product may be in quite a different one for another" (footnote omitted)). On the other hand, it is not untenable to argue that the term requires some thought to reach a conclusion as to the interview-music format of the program and, thus, is suggestive. Choosing the precise category in which to put the term is difficult, however, because the line separating the two is a fine one. Moreover, the decisions in the area are of little help and can best be characterized as inconsistent. *See* 3 Callman's Unfair Competition Trademarks and Monopolies § 71.2 (3d ed. 1969) [hereinafter cited as Callman's]. The net result of these decisions is that marks characterized as suggestive and descriptive "shade gradually, almost imperceptibly, from one type into the other." 3 *Id.* § 71.2, at 169 n.29 (quoting *Ex parte Pillsbury Flour Mills Co.*).[5]

**4.** LBS has argued that "The Music Makers" is a generic term. We cannot agree, however, because the term is not the name of a particular class of television or radio programs.

**5.** It has been noted that

"[t]he difficulty of distinguishing between words which are descriptive and those that are suggestive has always disturbed me. It is of course easy, when passing upon the question, to regard a particular mark intently and to then categorize it spontaneously. Such a process is classification by intuition rather than by deduction. It consists in relying upon one's ability to tell from mere objective inspection whether a word is descriptive or suggestive. The difficulty with this process, as a judicial one, is that it invariably results in conflicting decisions. No one can be sufficiently consistent to drop all descriptive marks into the box labeled 'descriptive' [and all suggestive marks into the box] labeled 'suggestive.' In no time at all each box will contain an irrational assortment of words, the collection of which, within a single grouping, cannot logically be justified.

"The difficulty is that such marks shade gradually, almost imperceptibly, from one type into the other. A single decision leads invitingly to a decision going a little farther afield, that one to another a little more remote, and so on, until one suddenly realizes, generally with dismay, how far he has traveled from the starting point and that the path which once seemed so clear has become thoroughly cluttered and obscured, preventing return to the point of departure."

3 Callman's, *supra*, § 71.2, at 169 n.29 (quoting *Ex parte Pillsbury Flour Mills Co.*)

■ Although we lean toward characterizing "The Music Makers" as descriptive of Narwood's series, the difficulties inherent in choosing between the two categories lead us to forego making such a determination at this juncture.[6] Rather, for the purposes of this motion, it seems sufficient to observe that Narwood's mark is not particularly distinctive and, thus, entitled only to a modicum of trademark protection. Additionally, it should be noted that whatever strength the mark possesses is diminished somewhat by the lack of any substantial evidence that "The Music Makers" has acquired a secondary meaning. As the Second Circuit has noted, the absence of substantial evidence of secondary meaning can be considered "as a factor weighing against a finding of a likelihood of confusion." *Vitarroz Corp. v. Borden, Inc., supra*, 644 F.2d at 968.[7]

### 2) *Similarity of the Marks*

Turning to the second factor in the likelihood of confusion analysis, similarity of the marks, we are faced with the question of what marks should be compared. When LBS sells its concert series to various television stations, it describes the series as "LBS's Music Makers in Concert." In advertising the first program of the series in April 1982, however, WNEW–TV in New York referred to the series as "Music Makers in Concert." Additionally, TV–Guide

listed the series as "Music Makers," and New York Magazine listed the series as "Music Makers in Concert." Thus, the issue is whether Narwood's mark, "The Music Makers," should be compared to "LBS's Music Makers in Concert" or one of the advertised versions without LBS's company name.

Although Narwood strenuously urges this Court to hold LBS responsible for the actions of the television station and the magazines in abbreviating the title, we cannot agree. To do so would require the conclusion that LBS had intentionally induced these third parties to advertise in this manner or that LBS has continued to supply its product to these parties, knowing or having reason to know that they are advertising in this manner. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, —— U.S. ——, —— & n.13, 102 S.Ct. 2182, 2188 & n.13, 72 L.Ed.2d 606 (1982) (standard for contributory trademark infringement). Although it is reasonable to conclude that LBS should have anticipated the use of "LBS's Music Makers in Concert" to advertise the series, there is nothing in this record to indicate that use of a truncated form of the mark was intended or, indeed, should even have been reasonably foreseen. Moreover, at this early stage of the distribution of LBS's program, we cannot conclude that Narwood has demonstrated continued supply of the program to parties whom LBS

**6.** Were we to conclude that "The Music Makers" is a descriptive term, this motion could be denied on that basis alone because the term has not attained a secondary meaning. We do not believe that the plaintiff's showing that the program has a weekly audience of over 3 million listeners and that it has expended over $125,000 to promote the program is sufficient to establish that "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co., supra*, 305 U.S. at 118, 59 S.Ct. at 113; *see Del Laboratories, Inc. v. Alleghany Pharmacal Corp.*, 516 F.Supp. 777, 781 (S.D.N.Y.1981).

**7.** It should also be noted that the term "Music Makers" has been registered as a trademark in connection with other products and services on both the federal and state levels. Although it is

unclear whether we can view this as a factor diminishing trademark strength, *see Del Laboratories, Inc. v. Alleghany Pharmacal Corp.*, 516 F.Supp. 777, 781–82 (S.D.N.Y.1981); *compare Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 199 n.2 (2d Cir. 1962) (court found that "Triumph" was a weak mark as "it ha[d] been used many times to identify many types of products and services") *with Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage."), and thus, unwise to do so, we do point out that "the Patent and Trademark Office [and the state trademark offices] did not exercise [their] discretion . . . and decline to register these marks as 'likely to cause confusion' despite similar existing registrations." *Del Laboratories, Inc. v. Alleghany Pharmacal Corp., supra*, 516 F.Supp. at 782.

has reason to know are using the truncated form of the mark in advertisements.[8]

■ Having resolved this issue, we need only note that "The Music Makers" and "LBS's Music Makers in Concert" are not identical. Although identity of the trademarks is not the *sine qua non* of a successful cause of action, the lack of similarity certainly can be considered in assessing the merits of the case.[9] In this instance, the defendant's use of its company name and the words "in Concert" are factors militating against a finding of likelihood of confusion. *See Vitarroz Corp. v. Borden, Inc., supra,* 644 F.2d at 969; *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1134.

### 3) Proximity of the Products

■ The proximity of the products that bear the trademarks in question is another factor relevant to a determination of likelihood of confusion—as the competitive distance between the products increases, the chances of likelihood of confusion decreases. In considering product proximity, the Court should consider factors such as

the physical attributes or essential characteristics of the goods, with specific reference to their form, composition, texture or quality, the service or function for which they are intended, the manner in which they are advertised, displayed or sold, the place where they are sold, or the class of customers for whom they are designed and to whom they are sold.

3 Callman's, *supra,* § 82.2(c), at 807; *accord, Del Laboratories, Inc. v. Alleghany Pharmacal Corp.,* 516 F.Supp. 777, 782–83 (S.D.N.Y.1981); *Lambda Electronics Corp. v. Lambda Technology, Inc., supra,* 515 F.Supp. at 926.

■ The programs in Narwood's series and the programs in LBS's series can both be characterized as musical in nature. Beyond that, however, the similarities end. First, the formats of the programs are slightly different. Narwood's programs have a music-interview format. Each consists of music of one entertainer interspersed with excerpts from interviews with that entertainer. LBS's program, on the other hand, essentially is a telecast of an entertainer giving a concert type performance. Second, the substance of the programs is different, that is, they are directed to different audiences. While Narwood's program is directed to an "adult listening" and "middle of the road" audience, LBS's series generally features contemporary music. As Narwood concedes, five of the first six concerts in the LBS series—ABBA, Peter Allen, Rita Coolidge, Ian Hunter, and The Pointer Sisters—do not fit Narwood's "middle of the road" program profile. (Only Sammy Davis, Jr., an entertainer who is not scheduled to be featured in Narwood's series, fits the profile.) Most importantly, Narwood's program is broadcast over radio; LBS's program is broadcast over television. That the programs are broadcast over different mediums enlarges the competitive distance between them.

### 4) Sophistication of the Purchasers

A consideration related to product proximity is the sophistication of the product's purchasers. As the Second Circuit has noted,

"every product has its own separate threshold for confusion of origin." The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.

---

**8.** That we utilize the standard for finding contributory trademark infringement should not be taken as an indication that the third parties' use of the truncated form of LBS's mark infringes on Narwood's mark. Even if we held LBS responsible for the actions of these third parties, it is far from clear whether LBS would be liable to Narwood.

**9.** Conversely, "even close similarity between the two marks is not dispositive of the issue of likelihood of confusion." *McGregor-Doniger Inc. v. Drizzle Inc., supra,* 599 F.2d at 1133.

*McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1137 (quoting *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 733 (2d Cir. 1978)).

In the instant case, there are two groups of purchasers, and one is more sophisticated than the other. *Cf. id.* 599 F.2d at 1138 ("where a buyer market [is] composed of both discriminating and relatively unknowledgeable buyers, a court must consider the probability of confusion on the part of the latter as well as the former"). The initial purchasers are the television and radio programming personnel who buy the programs from Narwood and LBS for broadcast on their respective stations. This group is highly sophisticated. Regardless of any trademark, they would surely be well informed about the nature of a program and its producer before making a programming decision. Thus, the possibility that these professionals would ever be confused about the producer of a program is almost nil.

The second group of purchasers is the audience that listens to and views the programs. *See Westwood One, Inc. v. National Broadcasting Co.*, No. 82–976, slip op. at 6 (C.D.Cal. April 9, 1982) ("Since it is a program's ability to attract an audience which gives it its value as an advertising vehicle, the degree of care exercised by the audience is [important]."). As to this group, it is reasonable to conclude that they are more likely to be misled by similar marks than the professional programmers. Indeed, because they have no financial stake in choosing a program, the average member of the audience would probably devote as little attention to ascertaining the producer of a program as the "average purchaser of a ball of twine." Thus, insofar as the purchasers of the products are the average television and radio listeners, the sophistication of the purchasers is a factor that could be said to support the plaintiff's position. (It seems likely, however, that what will actually influence the prospective audience is the featured performer. A Benny Goodman or Rosemary Clooney fan would probably have little interest in a program featuring the music of ABBA or The Pointer Sisters.)

### 5) *Actual Confusion*

Evidence of actual confusion, although not necessary for the plaintiff to prevail, *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1136, is strong evidence of a likelihood of confusion. *Lambda Electronics Corp. v. Lambda Technology, Inc., supra*, 515 F.Supp. at 926. Conversely, " 'it is [appropriate] for the trial judge to infer from the absence of actual confusion that there [is] no likelihood of confusion.' " *McGregor-Doniger Inc. v. Drizzle Inc., supra*, 599 F.2d at 1136 (quoting *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.*, 513 F.2d 1183, 1188 (2d Cir. 1975)).

No evidence of actual confusion has been presented in support of Narwood's motion. Because both programs have had limited exposure in the industry and because of the difficulty in establishing actual confusion, however, Narwood asks this Court to view the absence of actual confusion as a "neutral" factor—presumably this means a factor that neither supports nor cuts against Narwood's position. This is untenable. By making this motion, Narwood is effectively asserting that the present state of affairs justifies the issuance of a preliminary injunction. As the present state of affairs includes the absence of any actual confusion, it certainly seems proper for this Court to consider the absence of actual confusion and to view it as a factor militating against a conclusion that Narwood is likely to succeed on the merits of its claim.

### 6) *Bridging the Gap*

The likelihood that the plaintiff will bridge the gap, that is, compete directly with the defendant, bears both upon the likelihood of confusion and the equities of the case. *See Lambda Electronics Corp. v. Lambda Technology, Inc., supra*, 515 F.Supp. at 924, 928. In considering this factor, the cases essentially require the court to make two inquiries. The first is whether there is a present intention by the plaintiff to compete directly with the defendant. *See McGregor-Doniger Inc. v.*

Drizzle Inc., supra, 599 F.2d at 1135; Lambda Electronics Corp. v. Lambda Technology, Inc., supra, 515 F.Supp. at 926. Such an intention would increase the likelihood of confusion, id. at 926, and, as the trademark laws protect "the senior user's interest in being able to enter a related field at some future time," Scarves By Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1172 (2d Cir. 1976), would be an equitable factor supporting the plaintiff's claim for relief. Lambda Electronics Corp. v. Lambda Technology, Inc., supra, 515 F.Supp. at 928. The second inquiry is whether, regardless of any intention to bridge the gap, "consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies." Id. at 926; see McGregor-Doniger Inc. v. Drizzle Inc., supra, 599 F.2d at 1136. This inquiry is probative only of the likelihood of confusion. See Lambda Electronics Corp. v. Lambda Technology, Inc., supra, 515 F.Supp. at 926.

The answer to the first inquiry is clear and does not lend any support to Narwood's position. Although Narwood claims that there is a possibility it may someday enter the television market, it is clear that there is no present intention to do so. Indeed, Narwood had admitted as much in its papers.

As to the second inquiry, Narwood argues that audiences are likely to conclude that the producers of the two programs are the same because audiences are aware of the entertainment industry's practice of using popular programs to generate similar programs, or "spin offs," under the same or related marks. For the purposes of this motion, we will conclude that Narwood's argument has some merit. It will not be accorded great weight, however, for two reasons. First, although it may be a practice to "spin off" shows in the same medium, we are not familiar with any examples of a "spin off" from one medium to another. Second, the only support for the conclu-

sion that audiences are aware of this industry practice is an affidavit by Narwood's president. Thus, we will view Narwood's argument as a factor, albeit not a particularly strong one, lending some support to a finding of likelihood of confusion.

### 7) *Quality of the Defendant's Product*

The quality of the defendant's product is an equitable factor, not one bearing on whether consumers are likely to be confused. Specifically, courts consider inferior quality as a factor entitling the plaintiff to relief to protect the interest of the senior user in "the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise." Scarves By Vera, Inc. v. Todo Imports Ltd., supra, 544 F.2d at 1172; accord, Del Laboratories, Inc. v. Alleghany Pharmacal Corp., supra, 516 F.Supp. at 784. In this case, however, there is no evidence that the quality of LBS's television program is inferior to that of Narwood's radio program.[10]

### 8) *Defendant's Intent*

The intent of the junior user in adopting the allegedly infringing mark is another equitable factor that must be considered by the Court. Indeed, it is quite an important one. As one court has noted, "[i]f the junior user has acted entirely in good faith, it will have a powerful equitable argument against a finding of infringement. On the other hand, if the junior user adopted the plaintiff's mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement." Lambda Electronics Corp. v. Lambda Technology, Inc., supra, 515 F.Supp. at 929.

Unquestionably, LBS's decision to use "Music Makers" as the name of its series was made in good faith. Before adopting its mark, LBS conducted a trademark search. As a result, LBS's attorneys informed it that the term "Music Makers" could be used because its already widespread use precluded any claims of exclu-

---

10. Although this motion was briefed before the first program of the LBS series was broadcast, two programs have subsequently been aired. It is reasonable to assume that any inferiority would have been brought to the Court's attention, especially in view of the fact that other subsequent developments have been so noted.

sive trademark rights. Moreover, as Narwood's mark is not yet registered, the search conducted by LBS did not reveal Narwood's use of the term, and LBS had no knowledge of that use until early 1982. Finally, that LBS is not attempting to capitalize on goodwill that Narwood may have cultivated is amply demonstrated by its decision to alter its mark from "Music Makers" to "LBS's Music Makers in Concert" once it learned of Narwood's program.

*Conclusion*

A preliminary injunction "is an extraordinary and drastic remedy [that] should not be routinely granted." *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977). This is not one of those extraordinary cases. Narwood's trademark is not particularly strong; the marks and products, although similar, differ in ways that reduce the possibility of confusion; there has been no actual confusion; the plaintiff has no intent to compete directly with the defendant; LBS has acted in good faith; a segment of the products' purchasers are highly sophisticated; and the quality of LBS's series is not inferior to that of Narwood's. A consideration of these factors, as well as those supportive of Narwood's position, leads this Court to conclude that it is not likely that Narwood will prevail on the merits of this case.[11] Accordingly, its motion for a preliminary injunction is denied.

SO ORDERED.

11. Shortly before this opinion was filed, Narwood brought the case of *Westwood One, Inc. v. National Broadcasting Co.*, No. 82–976 (C.D. Cal. April 9, 1982), to the attention of this Court. Although *Westwood* bears some similarity to the present case, it does not lend a great deal of support to Narwood's position.

In *Westwood*, the plaintiff was the owner of the "registered service mark, 'Off the Record,' for radio programs featuring interviews with music personalities," and the defendant used "the title 'On the Record' for a similarly-formatted segment of its television program 'Today.'" *Id.*, slip op. at 1–2. Finding that the plaintiff's mark was suggestive and that likelihood of confusion was probable, the court issued a preliminary injunction against the defendant's use of "On the Record." On reconsideration, however, the court reversed its finding that the plaintiff was likely to succeed on the merits and vacated the preliminary injunction because newly discovered evidence indicated that "Off the Record" was confusingly similar to an already existing mark, "On Record," that is used as the title of a radio program consisting of record reviews and interviews with performers. *See* 15 U.S.C. § 1052(d) (1976).

Even if the injunction had not been vacated and the case were binding on this Court, we do not believe that *Westwood* mandates a decision in Narwood's favor. Several distinctions lead us to this conclusion. First, *Westwood's* mark is stronger than Narwood's mark. If we viewed the two marks on a continuum between suggestive and descriptive, "Off the Record" would be closer to suggestive, and "The Music Makers" would be closer to descriptive. Second, the formats and substance of the programs in *Westwood* bore more similarities to each other than the programs in the present case. Finally, a reading of the *Westwood* case indicates that an important factor in the court's decision was the plaintiff's showing that it was preparing to expand its program into television. *Id.*, slip op. at 1–2, 5. No such intention has been shown in the present case.