**EDISON BROTHERS STORES, INC., a Delaware Corporation, Plaintiff,**

**v.**

**COSMAIR, INC., a Delaware Corporation, Defendant.**

**No. 86 Civ. 3871 (LLS).**

United States District Court, S.D. New York.

Jan. 7, 1987.

Niro, Scavone, Haller & Niro, Ltd., Chicago, Ill. (Thomas G. Scavone, Kathleen A. Lyons, of counsel), Parker, Auspitz, Neeseman & Delehanty, P.C., New York City (Mark P. Ladner, of counsel), for plaintiff.

Brumbaugh, Graves, Donohue & Raymond, New York City (Russell H. Falconer, Doreen J. Leavens, Brendan J. O'Rourke, of counsel), for defendant.

STANTON, District Judge.

In this trademark infringement action, plaintiff Edison Brothers Stores, Inc. ("Edison"), owner of the trademark NOTORIOUS for use on women's clothing and shoes, sues to enjoin defendant Cosmair, Inc., ("Cosmair") from using the mark NOTORIOUS on perfume products. Upon the testimony during three days of trial, the trial exhibits, and the demeanor of the witnesses, I find that while Edison owns valid trademark rights in NOTORIOUS for women's clothing and shoes, those rights are not infringed by the proposed use of NOTORIOUS on perfume by Cosmair, nor by the use of NOTORIOUS on cosmetics, skin care products and perfume by Cosmair and its predecessor in interest Notorious Enterprises.

## FACTS

Edison is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 501 North Broadway, St. Louis, Missouri. Edison is a national retailer of women's and men's apparel and related accessories. It owns and operates over 2,400 retail stores across the country.

Cosmair is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 575 Fifth Avenue, New York, New York. Cosmair is a manufacturer of perfume fragrances and cosmetics which it distributes nationally.

This action was commenced by Edison in the Northern District of Illinois on April 2, 1986. In its complaint, Edison alleged trademark infringement, sought a declaration of various trademark rights, and claimed that Cosmair had engaged in acts of unfair competition by interfering with Edison's prospective business relations. One week later, on April 9, the court entered an order permitting expedited discovery. On April 23, the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a). The unfair competition and declaratory claims were dismissed by stipulation one week prior to trial.

### *Edison.*

Edison owns United States Trademark Registration No. 1,239,533 filed on June 1, 1982 and registered on May 24, 1983 for the mark NOTORIOUS for use on "junior's clothing, namely pants, shirts, tops and jackets." The mark is depicted in block letters:

Edison first sold women's pants with this mark on April 17, 1982. Edison sells clothing bearing the NOTORIOUS trademark only in its approximately 250 "Size 5-7-9 Shops", many of which are located in malls across the country. These stores sell "fashion forward" or trendy small-sized women's apparel in the $15-$40 price

range. Most of their customers are teenagers. NOTORIOUS clothing is not advertised. Sales of NOTORIOUS clothing since its introduction in 1982 total approximately $5 million.

Edison also owns United States Trademark No. 1,383,472 filed on July 12, 1985 and registered on February 18, 1986 for the mark NOTORIOUS in a stylized script version, for use on women's shoes. This mark is depicted as follows:

Edison first sold women's shoes with this mark in its Chandlers shoe stores as "NOTORIOUS for Chandlers" on June 26, 1985. Size 5–7–9 Shops began using this stylized or script version of the NOTORIOUS mark on women's apparel sometime after June 1985. Edison also then began selling handbags, belts and hosiery with NOTORIOUS tags in the Chandlers shoe stores. No figures for sales of these accessory items were provided.

Edison sells women's shoes bearing the NOTORIOUS mark only through its approximately 110 Chandlers shoe stores located across the country. These stores sell NOTORIOUS evening shoes at prices which average $39 a pair, but range as high as $75. The customers are characterized as "upscale professional fashionable [20–50 year old] women." Sales since June 1985 through the first week of August 1986 of NOTORIOUS shoes total approximately $1.8 million. Edison spent nearly $60,000 advertising NOTORIOUS shoes in 1985, $50,000 of which was spent on advertisements in the December 1985 issues of *Vogue, Mademoiselle* and *New Woman.* The other $10,000 was for advertisements in various local shopping center advertisement sections of metropolitan newspapers.

On December 3, 1985, Faberge, Inc. ("Faberge") approached Edison requesting a license to use the NOTORIOUS mark to market women's perfume. The parties entered into negotiations, and an agreement in principle was struck. No written agreement had been executed at the time of trial.

In September 1985, Edison first learned of the existence of a small family partnership named Notorious Enterprises, which was using the mark NOTORIOUS on perfume, cosmetics and skin care products sold in Salt Lake City. When Edison applied to register the mark NOTORIOUS for shoes, the trademark examiner cited an earlier application of Notorious Enterprises for cosmetics and perfume, stated that it prevented Edison's registration of NOTORIOUS for shoes, and suspended further action on Edison's NOTORIOUS application pending a decision on whether the Notorious Enterprises perfume and cosmetics application would be approved.

Edison's attorney informed the Patent and Trademark Office that Edison owned a registration for NOTORIOUS covering women's clothing. On that basis, Edison obtained approval of its registration for NOTORIOUS covering shoes.

### Notorious Enterprises

Russell Isenburg is the Salt Lake City developer of the NOTORIOUS line of cosmetics and skin care products. During the middle and latter part of 1983, he sold small amounts of NOTORIOUS cosmetics and skin care products, and performed "make overs" on the premises of Ol' Softies, a local Salt Lake City soft sculptural and nail business. His products bore the following stylized script, hand-drawn by Mr. Isenburg:

Mr. Isenburg advertised the NOTORIOUS "make over" in the December 1983 issue of the magazine *Utah Holiday* (a monthly publication, 92% of whose circulation is within Utah). In late 1983 or early 1984, members of Mr. Isenburg's family formed a partnership named Notorious Enterprises. Mr. Isenburg worked for and became a partner in Notorious Enterprises, and he assigned to it his right, title, and interest in the mark NOTORIOUS. In June 1984, Notorious Enterprises opened a store in Salt Lake City's Crossroads Plaza and began selling cosmetics, skin care products and perfumes bearing Isenburg's stylized NOTORIOUS mark. The customers are characterized as upper middle class 25–55 year old Salt Lake City housewives and executives. Notorious Enterprises advertised NOTORIOUS skin care products, cosmetics and perfumes in 1984 and 1985 summer issues of *Utah Holiday*, and in a 1984 summer issue of *McCarty* magazine. No precise figures for sales of NOTORIOUS perfumes and cosmetics were presented at trial, but Mr. Isenburg estimated they reached $75,000 in 1984 and almost $130,-000 in 1985.

On May 2, 1985, Notorious Enterprises filed an application to register NOTORIOUS for perfume, fragrances, skin care products and cosmetics. That application included a declaration claiming a date of first use of NOTORIOUS on or before July 1983, and a date of first use in interstate commerce on or before October 1983. In an Office Action dated July 9, 1985, the Trademark Office refused Notorious Enterprises' application for registration because of Edison's prior block-lettered NOTORIOUS registration for clothing.

*Cosmair and the Completion of*
*Notorious Enterprises'*
*Registration*

Cosmair is a manufacturer and distributor of perfumes, colognes and cosmetics, and is licensed to sell them under several trademarks. Pursuant to license, Cosmair sells fragrances bearing such marks as POLO by Ralph Lauren, LAUREN by Ralph Lauren, Monogram by Ralph Lauren, as well as L'OREAL and LANCOME cosmetics. In addition, it distributes DRAKKAR NOIR by Guy Laroche, ANAIS–ANAIS by Cacharel and ARMANI by Giorgio.

In late 1984, the management of Cosmair's designer fragrance division, in conjunction with Mr. Ralph Lauren and Cosmair's advertising agency, planned to expand the LAUREN perfume and fragrance line. By September 1985, they decided that the name "NOTORIOUS—RALPH LAUREN" best fit the proposed new fragrance.

A trademark search on NOTORIOUS revealed Edison's clothing registration, and pending applications by Edison for shoes and by Notorious Enterprises for perfumes and cosmetics. Cosmair decided to purchase Notorious Enterprises' trademark and then reach some accommodation with Edison.

In October 1985 Cosmair employed a private investigator, David Woods, to contact Notorious Enterprises regarding the purchase of NOTORIOUS. On January 29, 1986, Notorious Enterprises assigned all of its rights, title and interest in the mark NOTORIOUS, including the trademark application, to David Woods for $85,000. In the January 29 agreement, Notorious Enterprises agreed to state to the Trademark Office that the date of the first use set forth in its original May 2, 1985 application was incorrect, and that the correct date was on or before November 1981. David Woods then assigned all rights in the mark, including the trademark application, to Cosmair on January 30, 1986.

In a January 7, 1986 response to the July 1985 Patent and Trademark Office Action, Notorious Enterprises had amended the list of goods to be covered by NOTORIOUS to

read as follows: perfumes, parfums, toilet waters, colognes, eau de toilette, skin moisturizing creams, skin soap, skin scrub (exfoliator), skin rinse, skin oil, eye shadow, blushes, lip sticks, lip pencils, eye pencils, mascara, eye disguise, foundation and brow sealers.

On February 12, 1986, the application was further amended to reflect a first use date of "on or before November 1981" and a first use in interstate commerce date of "on or before April 1982". After considering these amendments, the Patent and Trademark Office withdrew its initial rejection of the application. The office passed the application for publication on May 20, 1986.

Cosmair intends to use NOTORIOUS in block letter form on its Ralph Lauren perfume. It will read as follows:

# N O T O R I O U S

## RALPH LAUREN

## The Issue

Edison and Faberge on the one hand, and Cosmair on the other, each claim to be entitled to market perfume under the trademark NOTORIOUS (in the case of Cosmair, "NOTORIOUS—RALPH LAUREN").

This litigation ensued.

## DISCUSSION

The evidence at trial establishes that Edison is the senior user of the mark NOTORIOUS. Edison first used the mark in its block-lettered form on women's pants in interstate commerce on April 17, 1982. No credible evidence establishes a first-use date of the script form NOTORIOUS on skin care products and cosmetics by Russell Isenburg before Edison's first use of it on pants in April 1982. The evidence established bona fide commercial use, albeit on a small scale, of the trademark NOTORIOUS by Russell Isenburg on skin care and cosmetic products in the local Salt Lake City market, no earlier than July or later in 1983. No perfumes or fragrances were sold under the NOTORIOUS mark until June 1984.

The essential issue in the case is whether senior user Edison is entitled to protection of Edison's trademark NOTORIOUS against Cosmair's (or its predecessor's) use of the same mark on perfume.

Exclusive ownership rights in a trademark do not automatically entitle the owner to protection against all use of the word on other products. The test is the likelihood of confusion:

> Given a valid trademark, the critical issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of reasonable consumers would be misled, or simply confused, as to the source of the goods in question.

C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 17 (2d Cir.1985); see Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir.1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In determining the likelihood of confusion, one examines the factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), which include the (1) strength of plaintiff's mark; (2) similarity between the marks; (3) proximity between the goods or services; (4) likelihood that plaintiff will bridge the gap; (5) actual confusion; (6) defendant's intent; (7) quality of defendant's goods or services; and (8) sophistication of the buyers. Id. at 495. "No single Polaroid factor is determinative. Rather each must be considered in the context of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is a likelihood of confusion between the two parties' products." Plus Products v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir.1983) (citations omitted). There are additional considerations. See Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d at 495. These include such equitable factors as the conflicting interests of the parties in continuing their trademark use, see McGregor-Doniger Inc. v. Drizzle, Inc., 599 F.2d 1126, 1140 (2d Cir. 1979), and "the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user as compared to the benefit to the senior user that would result from the requested injunction". Thompson Medical Co., Inc. v. Pfizer Inc., 753 F.2d 208, 214 (2d Cir. 1985), citing Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, 536 (2d Cir.1964); see generally Inc. Publishing Co. v. Manhattan Magazine, Inc., 616 F.Supp. 370, 378 (S.D.N.Y.1985).

These factors organize analysis of the facts so as to give appropriate recognition to three interests which justify trademark protection covering non-identical products: first, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of tarnish by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks—a factor which may weigh in the senior user's favor where

the defendant has not developed the mark himself. *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2d Cir. 1976). Against the first two interests of the senior user is balanced the legitimate interest of an innocent second user. *Avon Shoe Co., Inc. v. David Crystal,* 279 F.2d 607, 613 (2d Cir.1960).

Here, the evidence respecting these factors leads to the conclusion that Edison's ownership of NOTORIOUS for its clothing and shoes does not justify enjoining Cosmair's use of the mark for perfume. Edison has not carried its burden of proof of the likelihood of confusion. Cosmair's use of NOTORIOUS on perfume does not create a likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused into believing that the source of Cosmair's NOTORIOUS perfume is the same as the source of Edison's clothing or shoes.

(1) Strength of Plaintiff's Mark

 The distinctiveness of a mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular (even though anonymous) source, determines the mark's strength or weakness. *McGregor-Doniger,* 599 F.2d at 1131. The relative strength of a mark is measured by two factors: (1) the placement of the mark on the spectrum of marks; and (2) the marketplace recognition value of the mark. The first factor identifies the inherent potential of the mark at the time of its first use. The second describes its actual consumer recognition value at the time registration is sought, or at the time it is asserted in litigation to prevent another's use. 1 McCarthy, *Trademarks and Unfair Competition,* § 11.25, pp. 509–10 (2d ed. 1984); *accord McGregor-Doniger,* 599 F.2d at 1131–33; *Plus Products,* 722 F.2d at 1005–1006.

To determine "distinctiveness" for purposes of the first inquiry, trademarks are ranked in four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *McGregor-Doniger,* 599 F.2d at 1131. A generic term "refers ... to the genus of which the particular product is a species" and is not entitled to legal protection or trademark registration. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). A descriptive mark is one which "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Stix Products, Inc. v. United Merchants & Manufacturers Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968), *e.g.,* "World Book" for an encyclopedia, *see Field Enterprises Educational Corp. v. Cove Industries, Inc.,* 297 F.Supp. 989 (E.D.N.Y.1969). Descriptive marks, like generic ones, are considered inherently weak and may be protected or registered only upon a showing of "secondary meaning". *McGregor-Doniger,* 599 F.2d at 1131.

A suggestive mark has not been clearly defined, *see Abercrombie & Fitch Co.,* 537 F.2d at 10, but appears to be one that "require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods", *Stix Products,* 295 F.Supp. at 488, or one which only "indirectly" describes the goods or services at issue, *e.g.,* "Coppertone" for suntan oil, *see Douglas Laboratories Corp. v. Copper Tan, Inc.,* 210 F.2d 453 (2d Cir.), *cert. denied,* 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109 (1954). An arbitrary or fanciful mark is a term having no association with the particular product or service, *see Abercrombie & Fitch Co.,* 537 F.2d at 11, such as "Kodak" for photographic equipment. Marks in these last two categories may be registered without proof of secondary meaning.

Edison's use of the mark NOTORIOUS best fits into the "arbitrary or fanciful" category. Arbitrary marks comprise those words which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services. 1 McCarthy, *Trademarks and Unfair Competition,* § 11.4, p. 439 (2d ed. 1984). NOTORIOUS is a common word applied by Edison in an unfamiliar or arbitrary manner; its ordinary meaning does not describe apparel or shoes. It is therefore conceptually strong when applied to apparel and shoes.

In evaluating the "strength" of a mark, however, one considers not only its conceptual strength (described above) but also its commercial strength: that is, its significance in the marketplace as identifying the origin of goods. *McGregor-Doniger*, 599 F.2d at 1131–32; *Del Laboratories, Inc. v. Alleghany Pharmaceutical Corp.*, 516 F.Supp. 777, 781 (S.D.N.Y.1981).

Edison's Size 5-7-9 Shops have never advertised or otherwise promoted NOTORIOUS clothing. Tr. 16. Edison's NOTORIOUS clothing sales, although signifying a modest success, are not dramatic. There is no indication that even customers of Edison's 5-7-9 Shops recognize NOTORIOUS, or that the mark plays any role in their selection of these products. Edison's Chandlers shoe store chain has spent a modest amount advertising NOTORIOUS shoes. Nevertheless, NOTORIOUS is not widely recognized in the marketplace and cannot be deemed particularly strong commercially, or analogous to the famous "designer" trademarks.

Arguing that use by others of a similar mark weakens Edison's rights, *see Scarves by Vera*, 544 F.2d at 1173–74 (citations omitted), Cosmair also points to one instance of third-party use of the mark NATORIOUS. Starting in the fall of 1984, one Natori, a manufacturer and distributor of high-grade ladies' lingerie and garments, began using the designation NATORIOUS in the advertising and promotional theme "For The Natorious Woman". Such advertising has appeared about sixteen times in *Vogue, Women's Wear Daily*, the *New Yorker, New York Times Sunday Magazine*, and *Town and Country*. Natori has also used the phrase in point-of-purchase material. On May 30, 1986, Edison sent a "cease and desist" letter to Natori.

Considering both the conceptual and commercial aspects of the mark NOTORIOUS, it is not particularly strong.

(2) Similarity Between the Marks

■ In determining similarity between the marks in question, the focus is "the general impression conveyed by the two marks", *McGregor-Doniger Inc.*, 599 F.2d

at 1134, and similarity is relevant only insofar as it confuses prospective purchasers. *Ibid.* "Even close similarity between two marks is not dispositive of the issue of likelihood of confusion. [citation omitted] Rather, the similarity must be assessed in terms of its effect upon prospective purchasers". *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 257 (2d Cir. 1982). "[I]t is sufficient if the impression which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trademark." *McGregor-Doniger*, 599 F.2d at 1134 (citation omitted).

Similarity, for these purposes, is a functional test which must include "all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers" to determine whether it "is likely to provoke confusion." *McGregor-Doniger*, 599 F.2d at 1133. One must consider both the similarity of the names and the manner of their presentation to the public.

■ First, the character of the marks must be considered. When arbitrary or fanciful marks are involved, the distinctiveness of the marks will make the public more conscious of similarities than differences. *Procter & Gamble v. Johnson & Johnson*, 485 F.Supp. 1185, 1197 (S.D.N.Y. 1979), *aff'd mem.*, 636 F.2d 1203 (2d Cir. 1980). The test is not whether the consumer will know the difference if he sees the competing products on the same shelf. Rather, it is whether he will know the difference if the junior mark is singly presented and he has heard of the senior mark. *American Home Products · v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir.1978); *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1133 (2d Cir.1982).

Edison's mark NOTORIOUS and that of Notorious Enterprises, and its successor in interest, Cosmair, are phonetically identical. The script forms are visually highly similar, but Cosmair will not use the script form for its perfumes. Moreover, the po-

tential for confusion is reduced by the differing contexts in which the marks are presented. *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981); *Spring Mills Inc.*, 689 F.2d at 1130–31. "[T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it." *McGregor-Doniger*, 599 F.2d at 1133 (quoting Restatement of Torts § 729, Comment b at 593).

The overall packaging context of the parties' goods is significantly different. In the context of the marketplace, the possibility of confusion is only slight. Edison's NOTORIOUS mark, originally block-lettered but now in script, is used as a label on the inside of women's apparel and evening shoes. Notorious Enterprises used the mark in a similar script on cosmetic and perfume packaging. Cosmair, Notorious Enterprises' successor in interest, will use the mark NOTORIOUS on perfume and cologne in block letter form, with "Ralph Lauren" in block letters of about half the size those of NOTORIOUS, positioned below NOTORIOUS. Its packages are purple, as are the faceted perfume bottles.

Differences in the typeface of the marks are considered in determining the similarity between the two. *C–Cure Chemical Co., Inc. v. Secure Adhesives Corp.*, 571 F.Supp. 808, 815 (W.D.N.Y.1983) (citing *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons*, 523 F.2d 1331, 1339 (2d Cir. 1975). This difference serves to distinguish the marks visually. *Grotrian*, 523 F.2d at 1339.

The word NOTORIOUS will be used by Cosmair in close conjunction with the name Ralph Lauren, which will be in smaller letters. The Second Circuit noted in *McGregor-Doniger* that "[t]he fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion." *McGregor-Doniger*, 599 F.2d at 1134. The District Court found, and the Court of Appeals agreed, that "[i]n the light of this conjunction [of plaintiff's house mark MCGREGOR and DRIZZLER], defendant's use of the single word 'DRIZZLE' ... reduces the similarity that is shared by the two marks when they are compared out of context." *McGregor-Doniger Inc. v. Drizzle, Inc.*, 446 F.Supp. 160, 163–64 (S.D.N.Y.1978); *see also Buitoni Foods Corporation v. Gio. Buton & C.S.p.A.*, 680 F.2d 290, 292 (2d Cir.1982) (presence of signature along with BUITONI mark and not BUTON mark); *Vitarroz Corp.*, 644 F.2d at 969 (likelihood of confusion of BRAVO'S and BRAVOS marks reduced when marks always presented in association with company names); *contra, Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555 (S.D.N.Y.1978) (addition of distinguishing phrase "by MARCO POLO" to POLO for men's wearing apparel insufficient to eliminate likelihood of confusion with plaintiff's strong mark POLO by Ralph Lauren). The fact that only one mark appears in close conjunction with "Ralph Lauren" increases the likelihood that the public, even when viewing the marks individually, will not confuse the two. *McGregor-Doniger, Inc.*, 599 F.2d at 1134; *see also Lever Bros. Co.*, 693 F.2d at 257 (emphasis on regional bakery division on American's bread packages diminishes likelihood of confusion).

Further, whatever similarities exist between the marks is minimized by the difference in visual presentation. Neither the packaging nor the presentation of the brand names look alike.

In conclusion, the similarities between Edison's and Cosmair's marks are not confusing, while the dissimilarities are prominent. The similarities do not create any substantial likelihood that the defendant's products would be associated in the consumer's minds with Edison or its product.

### (3) Proximity of the Products

The proximity of the products bearing the word NOTORIOUS is another factor relevant to the likelihood of confusion. The degree to which consumers are likely to be confused about the sources of the product depends somewhat on their competitive closeness. Where, as here, the products are noncompetitive, the main concern is whether indirect harm might result to the senior user from loss of goodwill or

tarnishing of reputation if inferior goods are mistakenly attributed to him. *See generally McGregor-Doniger*, 599 F.2d at 1134–35. "The impression that noncompeting goods originate from the same source may be conveyed by such different factors as the physical attributes or other inherent characteristics of the goods, such as their form, composition, texture or quality; the service or function for which they are intended; the manner in which they are advertised, displayed or sold; the channels through which they are sold; and the class of customers for whom they are designed and to whom they are sold." 3A R. Callmann, *Unfair Competition, Trademarks and Monopolies*, ¶ 20.52, at 311 (4th ed. 1983); *accord, Del Laboratories, Inc. v. Alleghany Pharmaceutical Corp.*, 516 F.Supp. 777, 782–83 (S.D.N.Y.1981); *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y. 1981). Thus, in assessing the proximity of the products, courts consider "the nature of the products themselves and the structure of the relevant market." *Vitarroz Corp.*, 644 F.2d at 967.

The courts and the Trademark Office have recognized that cosmetics, toiletries and perfumes are complementary products to women's apparel, and related as part of an overall fashion picture which encompasses dress and beauty aids. *Cf., e.g., Scarves by Vera*, 544 F.2d at 1174; *Seligman & Latz, Inc. v. Merit Mercantile Corp.*, 222 U.S.P.Q. 720, 722 (T.T.A.B.1984) (record shows a close relationship between clothing products and cosmetic and toiletry products, so closely similar marks for them make confusion likely); *In re Barbizon International, Inc.*, 217 U.S.P.Q. 735, 738 (T.T.A.B.1983) (common use of identical marks for cosmetic and clothing goods marketed by same source, and intimate fashion relationship between women's cosmetics and clothing: such goods are highly related); *In re Christian Dior*, 225 U.S. P.Q. 533 (T.T.A.B.1985) (men's dress shirts and men's toiletries were related goods, sold in same stores to same customers, often during single shopping excursion). Cosmetics, toiletries and perfumes and women's clothing may be related commercially by advertisements in the same media and availability in similar retail outlets patronized by particular classes of purchasers; and they may both be purchased during the same shopping excursion.

Here, however, the parties' products have dissimilar physical attributes, they are directed to different consumers, and they are sold through different channels of trade. Cosmair plans to sell NOTORIOUS—RALPH LAUREN perfume or cologne for prices ranging from $38.50 for .27 ounces of cologne to $175 for a ¾ ounce bottle of perfume. These products will only be sold at Ralph Lauren counters at fashionable department stores such as Saks Fifth Avenue, Bloomingdales and Nieman-Marcus. The target customers are 25–49 year-old upper middle-class (household income of at least $60,000) "fashion-aware women". Advertising will be in such magazines as *Town and Country, Vanity Fair, Vogue, Harper's Bazaar, House & Garden.*

Edison sells its NOTORIOUS clothing primarily to teenagers for $15–$40 in shopping mall stores where it is not advertised. On the other hand, Edison sells its NOTORIOUS shoes for $39–$75 and has advertised them in *Vogue, Mademoiselle* and *New Woman.* There is little possibility that Edison NOTORIOUS clothing and Cosmair perfume would appear to a consumer to emanate from a common source. On the other hand, Cosmair's perfume and Chandlers shoes might attract overlapping segments of the female purchasing public. There is a possibility that Edison shoes and Cosmair perfume would be seen as having the same source, since there is a moderate product proximity.

Thus the Edison shoes and the Cosmair perfume are sufficiently close to raise the possibility of public confusion, but not to establish such a likelihood as to be of controlling significance.

(4) Likelihood that Edison Will Bridge the Gap

The likelihood that Edison will bridge the gap, that is, compete directly with Cosmair

in the perfume field, bears upon both the likelihood of confusion and the equities of the case. "Bridging the gap" refers to two different possibilities:

> The first is that the senior user presently intends to expand his sales efforts to compete directly with the junior user; likelihood of confusion is created by the likelihood that the two products will be directly competitive. The second possibility is that, while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies.

*Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y.1981) (citing *McGregor-Doniger*, 599 F.2d at 1135–36). Such an intention would increase the likelihood of confusion, and, as the trademark laws protect "the senior user's interest in being able to enter a related field at some later time," *Scarves by Vera*, 544 F.2d at 1172, it is an equitable factor supporting Edison's claim for relief. *Lambda Electronics Corp.*, 515 F.Supp. at 928. The desire of the senior user to bridge the gap creates an independent potential for confusion.

Edison presently intends to bridge the gap into the perfume market. It has reached an agreement in principle for the license of NOTORIOUS to Faberge for use with women's fragrances. Licensing is an accepted method of using one's mark and bridging the gap to related goods. *Cf. Bowmar Instrument Corp. v. Continental Microsystems*, 497 F.Supp. 947, 956 (S.D.N.Y.1980). Edison also presented evidence at trial that its Oak Tree and Jeans West chains of men's apparel stores began in the spring and fall of 1985 to use some of their men's apparel trademarks—CODA, LINNEA FRANCO and COSI L'UOMO—with men's cologne. No figures for sales of these colognes were provided.

(5) Actual Confusion

"No evidence of actual confusion is required in order to prove a likelihood of confusion." *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1024 (2d Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1979). However, since Edison's mark is not particularly strong, such evidence would aid Edison in demonstrating that the public is likely to confuse it with the source of Cosmair's products. No evidence was presented that customers, suppliers or even middlemen have been confused or misled by the concurrent use of NOTORIOUS on clothing and shoes on the one hand, and on cosmetics, skin care products and fragrances on the other. In Salt Lake City, Notorious Enterprises sold and advertised its line of cosmetics and fragrances within a few blocks of one Size 5–7–9 Shop. There were no reported incidents of confusion.

Evidence of actual confusion strongly indicates the likelihood of confusion. *Narwood Productions, Inc. v. Lexington Broadcast Services Co.*, 541 F.Supp. 1243, 1251 (S.D.N.Y.1982); *Lambda Electronics*, 515 F.Supp. at 926. "Although evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Lambda Electronics*, 515 F.Supp. at 926.

Similarly, the absence of actual confusion may indicate that there is no likelihood of confusion. *McGregor-Doniger*, 599 F.2d at 1136 (citations omitted). The fact that Edison and Notorious Enterprises (beginning with Russell Isenburg) operated concurrently from late 1983 until September 1985 without knowledge of each other negates the likelihood of confusion. In *Plus Products*, the Court found that three years of concurrent use of the marks without any instance of actual confusion was a "strong indicator that the likelihood of confusion is minimal." 722 F.2d at 1006 (parties had combined sales of $475 million and $11 million advertising expenditures during nine year period); *see also Lever Bros.*, 693 F.2d at 257 (no likelihood of confusion when no evidence of actual confusion despite combined sales of more than 60 million food items during three years); *Procter & Gamble*, 485 F.Supp. at 1201 (absence of evidence of actual confusion despite extensive consumer testing and full

test marketing for over a year in cities comprising 1½ of the population indicates little likelihood of confusion).

Both Edison and Cosmair introduced survey evidence on the issue of likelihood of confusion. Two factors affect the weight to be given to surveys: the format of the questions and the manner of conducting the survey.

Edison commissioned Elrick & Lavidge, Inc., a marketing research firm, to determine whether there is a likelihood of confusion between NOTORIOUS clothing and fragrance. Its survey consisted of personal interviews with 200 women shoppers, 16 to 45 years of age, in four geographically dispersed shopping centers. The women were shown a blouse and skirt with the NOTORIOUS trademark, and a fragrance bottle and its carton with the NOTORIOUS trademark from Notorious Enterprises. When asked whether the products were put out by the same or a different company, 58.5% of the women interviewed thought it was the same company. Twenty six percent thought that they were put out by different companies, and 15.5% said that they did not know or were not sure.

A control group of 200 women shoppers were shown the same NOTORIOUS clothing, and a fragrance bottle and carton bearing the name SAND & SABLE. 57.5% of these women thought that these products were put out by different companies, 24.5% thought that they were put out by the same company and 18% said that they did not know or were uncertain.

The difference between the proportions of the women who said that the clothing and fragrance products were marketed by the same company among those who viewed NOTORIOUS fragrance (58.5%) and those who viewed SAND & SABLE fragrance (24.5%), is 34%. Elrick & Lavidge concluded that there would be a likelihood of confusion with respect to source among a large proportion of women shoppers who saw NOTORIOUS clothing and a NOTORIOUS fragrance.

However, the side-by-side alignment of the products is a somewhat unrealistic simulation of actual market conditions. In light of the suggestive effect of proffering the two products simultaneously, I am not convinced of Mr. Lavidge's contention that "side by side comparisons increase the likelihood that the individual making [such a] comparison will differentiate between the two items. [Such] comparisons tend to, in our terms, exaggerate differences." Tr. 227.

The most serious flaw in the Elrick & Lavidge survey is that the interviewees selected weren't necessarily potential purchasers of either product. *See Del Laboratories,* 516 F.Supp. at 783. In *American Luggage Works, Inc. v. United States Trunk Co.,* 158 F.Supp. 50, 53 (D.Mass. 1957), *aff'd sub nom. Hawley Products Co. v. United States Trunk Co.,* 259 F.2d 69 (1st Cir.1958), the court stated:

[U]nder the substantive law the issue is not whether the goods would be confused by a casual observer ... but the issue is whether the goods would be confused by a prospective purchaser at the time he considered making the purchase. If the interviewee is not in a buying mood but is just in a friendly mood answering a pollster, his degree of attention is quite different from what it would be had he his wallet in hand. Many men do not take the same trouble to avoid confusion when they are responding to sociological investigators as when they spend their cash.

*Accord, Del Laboratories,* 516 F.Supp. at 783–84; *American Footwear Corp. v. General Footwear,* 609 F.2d 655, 660–61 n. 4 (2d Cir.1979); *cf. Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons,* 523 F.2d at 1340–41. The survey is not a convincing predictor of consumer confusion.

Cosmair's evidence was offered by Dr. Hans Zeisel, who conducted two surveys for Cosmair: (1) a recognition survey to determine the extent to which the mark NOTORIOUS is associated with Edison's products; and (2) a confusion survey to explore the extent to which use of the word NOTORIOUS by Cosmair would lead to confusion with products sold under that name by Edison.

For the recognition survey, 200 women, 16 to 45 years of age, were interviewed by telephone in Chicago, Illinois, and Rockaway, New Jersey. Eighty-six of the interviewees had shopped at a Size 5–7–9 Shop. Interviewees were asked whether they knew any product sold under the brand name NOTORIOUS, and if so, what product. Only six percent of the interviewees said they knew a product sold under the name NOTORIOUS; 94% said they did not know of one. The percentages were essentially identical in the two subgroups of interviewees, those who had shopped at Size 5–7–9 Shops and those who had not. The twelve women who said they knew a product sold under the name NOTORIOUS, when asked to identify it, answered as follows: perfumes and other cosmetics (9); clothes (1); and others (sunglasses and soap) (2). The woman who answered "clothes" had not shopped at Size 5–7–9 Shops. Dr. Zeisel testified that he had "never made a study in which consumer recognition of a brand name was so low". Tr. 465.

For the confusion survey, 258 women, 16 to 45 years of age, were interviewed in three malls with Size 5–7–9 Shops located in Chicago, Rockaway, New Jersey and Salt Lake City. 140 of these interviewees had shopped in Size 5–7–9 Shops. The interviewee was handed a container of Notorious Enterprises' NOTORIOUS perfume and was asked whether she had ever heard of or seen this brand. 14% of the shoppers in Salt Lake City had heard of it, while the percentages were 2% and 4%, respectively, in New Jersey and Chicago. Interviewees were then asked whether the company which makes this perfume NOTORIOUS markets or makes any other products under that name. 51% of the women who had shopped at Size 5–7–9 Shops stated that the company put out other products. Of those women who did not shop at Size 5–7–9, 29% said that the company made other products. Of the total, 61% said that the company did not put out other products or did not know whether it does, 36% said the company put out other cosmetics, and 3% said the company put out apparel items.

Dr. Zeisel concluded, as do I, that the two surveys, taken together, show no significant consumer awareness of a trademark for Edison's NOTORIOUS products and that, even if there were such an awareness, it is not confused with the Notorious brand of perfume.

(6) Defendant's good faith in adopting its mark

In trademark infringement actions this equitable factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product. *McGregor-Doniger*, 599 F.2d at 1137; *Spring Mills v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134–36 (2d Cir.1982) (defendant's choice of ULTRACASHMERE trademark and copying of the hang tag were blatant acts of trade piracy); *Procter & Gamble*, 485 F.Supp. at 1201. If the junior user has "adopted the mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement." *Narwood Productions*, 541 F.Supp. at 1252; *Lambda Electronics*, 515 F.Supp. at 929. If there is no evidence suggesting the presence of these motives, courts often find that the defendant acted in good faith. *Del Laboratories*, 516 F.Supp. at 784.

■ The fact that Cosmair had both actual and constructive notice in September, 1985 of Edison's registered trademark NOTORIOUS for clothing is not necessarily evidence of bad faith. *Mushroom Makers*, 580 F.2d at 48; *McGregor-Doniger*, 599 F.2d at 1137; *Procter & Gamble*, 485 F.Supp. at 1201. To the contrary, prior use of a trademark does not automatically entitle the first user to bar its use by others. *Mushroom Makers*, 580 F.2d at 48 (quoting *Federal Telephone & Radio Corp. v. Federal Television Corp.*, 180 F.2d 250, 251–52 (2d Cir.1950)). Even if a mark is registered, the presumption of an exclusive right to use it extends only so far as the goods or services noted in the registration certificate—here, women's apparel.

There is no suggestion that Cosmair or its predecessors in interest were or are seeking to capitalize on goodwill obtained by Edison through the use of its NOTORIOUS mark. Cosmair does not seek to benefit from any confusion between its products and those of Edison. I accept that Cosmair believes, in good faith and for good reason, that no such confusion will occur. Throughout Cosmair's process of name selection and advertising strategy development, there is no indication of an intention to trade on any association with Edison's NOTORIOUS trademark. Nor has Edison established the sort of extensive reputation and goodwill for its mark that would attract a trademark infringer interested in a free ride.

Cosmair is a substantial company. It has achieved its success by the marketing of quality products. Cosmair has expended approximately 1.3 million dollars on name selection, packaging, publicity, consumer testing and research during which many names were considered. It plans enormous expenditures in publicizing and promoting NOTORIOUS—RALPH LAUREN perfume. These facts indicate that Cosmair is relying on its own quality and publicity, and not on Edison's.

(7) Quality of Cosmair's Product

▉ Inferior quality is a factor entitling the senior user to protection of "the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise". *Scarves by Vera*, 544 F.2d at 1172. Consequently, where the junior user's product is of inferior quality, the senior user has an interest in enjoining the junior user from using the mark, and thus avoiding the risk that the public's perception of his product will suffer from confusion between himself and the junior user. *Lambda Electronics*, 515 F.Supp. at 929; *Procter & Gamble*, 485 F.Supp. at 1202.

When there is no evidence that a junior user is selling inferior merchandise or engaging in disreputable trade practices, this concern may be dismissed summarily. *See Mushroom Makers*, 580 F.2d at 49; *Del Laboratories*, 516 F.Supp. at 784. Both

Notorious Enterprises' and Cosmair's products are of high quality. There is thus no realistic possibility that Edison's reputation would be tarnished by sale of NOTORIOUS perfume by Cosmair.

(8) Sophistication of the Buyers

In determining the likelihood of confusion, the court should consider the level of sophistication of the relevant purchasers. *McGregor-Doniger*, 599 F.2d at 1137. The touchstone for determining the level of sophistication of the relevant purchaser is:

> The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods....

*Ibid.* Usually the price is a useful guideline to the care and thought put into a purchase:

> [E]very product has its own separate threshold for confusion of origin. The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.

*Ibid.* The degree of reliance by consumers on labels and trademarks will also vary from product to product. *Ibid.*

Edison sells its trendy or fashion-forward NOTORIOUS small-sized clothing primarily to and for teenagers. These apparel items sell in the $15–$40 price range. They may often be purchased on impulse with little or no consideration given to the particular trademark on the items. However, such a clothing purchase presumably includes personal examination and a fitting—not an entirely casual sale. The purchasers of these products are for the most part unsophisticated, although the purchase itself may not be casual.

Edison sells its women's shoes bearing the trademark NOTORIOUS at an average price of $39 a pair, but ranging as high as

$75. The customers have been characterized as "upscale professional fashionable [20–50 year old] women." Tr. 17.

Cosmair's NOTORIOUS perfume will sell in the range of $38.50 for .27 ounces of cologne, to $175 for ¾ ounce of perfume. Cosmair has targeted the perfume at the market of 25–49 year old upper middle-class (household income of at least $60,000) fashion-aware women. These purchasers of perfume are likely to devote a high degree of care and attention to their selection. They are likely to pay particular consideration to the RALPH LAUREN sponsorship of the perfume. This reduces the risk of confusion as to the source or sponsorship of the goods.

The above factors, on balance, clearly favor Cosmair's right to continue Notorious Enterprises' use of the mark NOTORIOUS on perfume and cologne products, there being little likelihood that an appreciable number of ordinarily prudent purchasers will be misled or confused into assuming Cosmair's NOTORIOUS perfume and Edison's clothing and shoes come from the same source.

(9) Balancing the Equities

In balancing the equities, the interests of the public, and of the senior user in relation to those of the junior user, must be considered. *Lambda Electronics*, 515 F.Supp. at 928. Since Edison has failed to establish a likelihood of confusion, the balance of interests of necessity tips in Cosmair's favor. Because the goods are not competitive, Edison's sales of NOTORIOUS clothing and shoes cannot be expected to suffer.

██ Nonetheless, the trademark laws protect the senior user's interest in being able to enter a related field at some future time. *Scarves by Vera*, 544 F.2d at 1172. Allowing Cosmair's use of the word NOTORIOUS on perfume restricts Edison's right to expand into that field. *Lambda Electronics* lists the following equitable factors pertinent to such a determination: the (a) likelihood that the senior user will bridge the gap; (b) good faith of the junior user; (c) quality of the junior user's product; and (d) junior user's goodwill.

(a) In the case of noncompetitive products, the likelihood that the senior user will bridge the gap between the two products indicates not only the likelihood of confusion, but also an equity favoring the senior user. This has been discussed above, and it presents equitable grounds for finding infringement.

(b) The state of mind of the junior user is an important factor in striking the balance of equities. A junior user who acted entirely in good faith has a strong equitable argument against a finding of infringement. Here it is clear that Cosmair acted in good faith in its selection of the trade name NOTORIOUS for its perfume.

(c) If Cosmair's product were of poor quality, Edison's interest in enjoining it and thus avoiding any confusion between the sources of the products, would obviously be heightened. There is no suggestion that Cosmair's products are not of high quality. This factor thus plays no role in the balance of equities.

(d) If the innocent junior user, through concurrent use of an identical trademark, has developed goodwill in the mark, he has a justifiable interest arguing against a finding of infringement. *Lambda Electronics*, 515 F.Supp. at 929; *Mushroom Makers*, 580 F.2d at 49. Here, while Notorious Enterprises used the word NOTORIOUS for some years, there is little evidence that it built up any significant goodwill in the mark. It engaged in no appreciable advertising. No reliable sales figures were presented for NOTORIOUS cosmetics, skin care, perfume and fragrance products. Any goodwill that Notorious Enterprises may have developed in its mark is of minimal value to Cosmair. At most, that goodwill is confined to the Salt Lake City area.

Thus, the purely equitable considerations are in a rough equivalence, and favor neither side decisively.

██ With respect to Edison's case as a whole, while some of them favor Edison, the *Polaroid* factors on balance lead to the determination that the use by Notorious Enterprises and its successor Cosmair of

the word "Notorious" as a trademark for perfume does not threaten confusion with Edison's NOTORIOUS clothes and shoes. That being so, Edison's expectation that as the first-registered trademark holder for clothes it had the right to expand to perfumes must give way to the fact that Notorious Enterprises actually used the word in connection with perfumes first.

### COSMAIR'S COUNTERCLAIM

 Cosmair contends that Edison's registration No. 1,239,533 was obtained on the basis of a declaration that was false insofar as it claimed use on a variety of clothing items, specifically "junior's clothing, namely pants, shirts, tops and jackets", when, in fact, the mark had appeared only on one item (pants) at the time the application was filed. It requests that Edison's registration therefore be cancelled. Edison's federal registration of the mark constitutes *prima facie* evidence of its validity, and shifts to defendant the burden of persuasion on the validity issue. *Rick v. Buchansky*, 609 F.Supp. 1522, 1536 (S.D.N.Y.1985) (citing *Cartier, Inc. v. Three Sheaves Co., Inc.*, 465 F.Supp. 123, 127–28 (S.D.N.Y.1979)).

Misstatements in a registration application provide a basis for cancelling the registration only if the misstatements were made with knowledge of their falsity, and were material to the determination to grant the application. *Rick*, 609 F.Supp. at 1537 (citing *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 384 (D.Md.1976)). "Statements of honest, but perhaps incorrect, belief or innocently inaccurate statements of fact are insufficient as are knowing misstatements which would have a *de minimis* effect on the validity of the service mark." *Ibid.* (quoting *Five Platters*, 419 F.Supp. at 384).

In the instant case, plaintiff's testimony at trial demonstrated that the erroneous statement on its service mark application was made innocently, and explained how the error came to be made. Moreover, there is no indication that the misstatement was in any way material to the decision that plaintiff's application should be granted.

The error on plaintiff's application for service mark registration therefore does not provide a basis upon which to cancel that registration.

### CONCLUSION

Judgment will be entered dismissing the complaint and dismissing the counterclaim, with costs to the defendant.