**WINDSOR, INC., Plaintiff,**

v.

**INTRAVCO TRAVEL CENTERS, INC., Defendant.**

No. 90 Civ. 3530 (CHT).

United States District Court, S.D. New York.

Aug. 17, 1992.

1514

Nims, Howes, Collison, Hansen & Lackert, New York City (Karen P. Clancy, of counsel), Polster, Lieder, Woodruff & Lucchesi, St. Louis, Mo. (Edward A. Boeschenstein, of counsel), for plaintiff.

Steinberg and Raskin, New York City (Martin G. Raskin, Clifford M. Davidson, of counsel), for defendant.

### OPINION

TENNEY, District Judge.

Plaintiff, Windsor, Inc. ("Windsor"), owner of the trademark INTRAV, brings this suit to enjoin defendant Intravco Travel Centers, Inc. ("ITC") from operating its business under that name. Plaintiff alleges that by using the name Intravco Travel Centers, Inc., defendant infringes plaintiff's trademark in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), dilutes its trademark in violation of section 368–d of the New York General Business Law

(McKinney 1984), and engages in common law unfair competition. The court finds that defendant has not infringed or diluted plaintiff's trademark, and has not engaged in unfair competition. Accordingly, the relief requested by plaintiff is denied. Defendant requests attorney's fees in this action, pursuant to either 15 U.S.C. § 1117 or Rule 11 of the Fed.R.Civ.Proc. The court, however, finds that there is not an adequate basis for awarding attorney's fees, and therefore denies defendant's request. The following, including those additional facts referred to in the Discussion, constitutes the court's findings of fact and conclusions of law pursuant Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Plaintiff Windsor is a Missouri corporation whose principal place of business is located at 7711 Bonhomme Avenue, St. Louis, Missouri. Joint Pretrial Order, Stipulated Facts & Plaintiff's Proposed Findings of Fact ("PTO") ¶¶ 1, 24 (filed Sept. 3, 1991).

2. Defendant ITC is a New York corporation whose principal place of business is located at 211 East 43rd Street, New York, New York. *Id.*

*The Plaintiff*

3. Windsor was founded in the early 1960s under the name International Travel Advisors, Inc. In 1965, however, the owner of the company concluded that this name was too cumbersome to distinguish his company's travel services from the services offered by other travel companies. Thus, in 1965, he selected INTRAV as the company's service mark and began promoting the company's tours and other travel services under that mark. In 1979, the company changed its name to Intrav, Inc., and in 1983, to Windsor, Inc.

4. Since its inception, Windsor has grown from a small travel business with a few employees to a large organization with several divisions and subsidiaries occupying several floors of a multi-story office building. Intrav, which is one of those divisions, is located in Windsor's St. Louis

offices and has over 110 employees. Trial Transcript ("Tr.") 31; Pl. Exh. 220, at 46.

5. In 1968, the United States Patent Office (now the Patent and Trademark Office) issued Reg. No. 855,720 on the Principal Register for the mark INTRAV to be used for "travel agency services." Pl. Exh. 226. In 1974, Windsor filed affidavits in the Patent and Trademark Office, pursuant to sections 8 and 15 of the Trademark Act, to verify continued use of the mark INTRAV; and in 1988, Windsor filed papers to renew the registration. Pl. Exh. 225. Windsor also holds Reg. No. 1,027,-951 on the Principal Register for the mark THE INTRAVLER, Windsor's travel newsletter. Pl. Exhs. 219–26.

6. Windsor is a tour operator in the business of producing, marketing and conducting sightseeing tours. Tr. 291–92, 388, 390. The tours are pre-packaged products that are marketed directly to potential passengers, most often through sponsoring organizations. Tr. 150–51.

7. Windsor's business operates by planning the itinerary for the proposed tour according to factors such as past popularity and profitability of similar tours. Tr. 52–53.

8. Once the tour itinerary is planned, but before the tour is offered for sale, Windsor "packages" the tour, i.e., it negotiates for and purchases the necessary components of the tour. Windsor purchases air and ground transportation, hotel accommodations, sightseeing excursions, and all other features to be included in the tour. Tr. 56. These tour components are purchased by Windsor at least one year before the tour is offered for sale. Tr. 136–37.[1]

9. Once the tour has been packaged, the plaintiff solicits "sponsorship" of the tour by organizations such as medical, bar, and university alumni associations. Tr. 59–60. By agreeing to sponsor a tour, an organization merely agrees to provide Windsor with a list of its members and allows Windsor to directly solicit its members while using the organization's name as having approved

and sponsored the program. Tr. 61–62, 154. The organization itself does not purchase anything from Windsor. Tr. 150–52. Windsor receives no money when an organization agrees to sponsor a tour, and the sole responsibility of a sponsoring organization is to provide its mailing list to Windsor and to allow solicitation of its members. Tr. 151, 154.

10. Windsor then markets the tour by preparing brochures that describe the details of the tour, including its itinerary, the dates of departure (the same tour usually has several departures), and the cost. The brochures, which prominently display the name of the sponsoring organization along with the INTRAV mark, are mailed by Windsor directly to the individual members of that organization, along with a cover letter printed on the sponsoring organization's letterhead. See Pl. Exh. 2, 3, 5, 7, 78; Tr. 62–63, 140–44. If an individual decides to take the tour, he or she completes a reservation coupon printed on the last page of the brochure and returns it with a deposit, made out either to the sponsoring organization or to Windsor. Tr. 64–65.

11. The tour itself is conducted by Windsor, using its own staff members who wear INTRAV uniforms with INTRAV name badges. The staff greets the tour members on arrival, acts as their tour guides, and maintains a hospitality desk for any problems or questions that may arise. See Tr. 32.

12. These tours represent the major portion of Windsor's business, and are referred to as "Deluxe Adventure" tours. Additionally, Windsor offers "Adventure Holidays" tours, which are similar to the Deluxe Adventure tours, but are marketed without sponsorship from any organization. Tr. 42–43. To sell these tours, Windsor prepares "Adventure Holidays" catalogs, which describe the tours planned for the following year, and sends them on a seasonal basis to travelers who have previously taken Deluxe Adventure tours. Tr. 78–79.

---

[1] In 1989, Windsor established a new division, *Conference Planners International*, which was used to adjust the pre-packaged tours to co-incide with an organization's upcoming conferences. Tr. 71–72. This division, however, no longer exists. *Id.*

13. The packaged nature of Windsor's tours is illustrated by the fact that many tours are repeated in substantially the same form year after year. Tr. 137, 150. For example, its "Danube River" tour has been offered every year since 1979, except in 1980 when it was cancelled due to the invasion of Afghanistan. Tr. 140. There were six departures of this tour in 1983, eight departures in 1984, ten departures in 1985, twelve departures in 1986, fourteen departures in 1987, sixteen departures in 1988, twenty-four departures in 1989 and 1990, and thirteen departures in 1991. *See* Pl. Exhs. 241–249; Tr. 140–44. Furthermore, Windsor is again offering the same Danube River tour in 1992 and is planning to offer it again in 1993. Tr. 144–45.

14. The tour packages sold by Windsor are standard tours of the sort that are offered by most standard tour companies. The tours do not seek to explore a particular subject matter in any depth and essentially provide a general impression of the lifestyles and history of the countries in which the tours take place. Tr. 388.

15. Windsor's tours are relatively expensive, having an average price of approximately $4,600, ranging from $2,300 for their least expensive tour to $48,800 for their "Around the World by Concorde" tour. Tr. 114. The tours are designed primarily for the comfort of the tour participants, who stay in five-star hotels and are transported in air-conditioned Mercedes Benz motorcoaches. Tr. 114. Thus, Windsor considers its tours to be "the best you can buy." Tr. 192.

16. The average size of a tour party for an INTRAV tour is sixty individuals, but the tours can be as large as 500 persons and as small as fifteen. Tr. 105. The average age of a participant on Windsor's tours is sixty-five years old. Tr. 184.

17. Windsor has sold a substantial number of INTRAV tours over the past twenty years. Pl. Exhs. 241–50. During 1990, for example, Windsor organized a total of thirty-seven programs, resulting in over 200 departures. Pl. Exh. 242; Tr. 39–45. Although sales volume for 1991 fell somewhat, sales of INTRAV tours now reach well into the millions of dollars. Pl. Exh. 241; Tr. 35, 49. Even in 1967, when Windsor was just establishing its tours under the INTRAV mark, sales exceeded $1 million. Pl. Exh. 250.

18. Because Windsor's tours are relatively expensive, its advertising is directed towards the "very top affluent traveler." Tr. 160, 169, 184. In order to promote its tours, Windsor distributes approximately 18 million travel brochures every year to members of professional organizations, such as medical and bar associations, university alumni and alumnae groups, and other organizations whose members are likely to be able to afford the cost of deluxe travel. Tr. 59–60, 160, 417. In addition, Windsor publishes the INTRAVLER magazine twice a year, which has a current circulation of 125,000 copies. Pl. Exh. 219–24; Tr. 425.

19. Windsor's direct mail marketing program constitutes its major promotional expenditure, costing several million dollars per year. Pl. Exh. 251; Tr. 167, 431–33. Windsor's brochures are mailed primarily to prior customers. Tr. 432. For example, in any given two year period, there is a 75% overlap between the first and second year's mailing list. *Id.*

20. Other than distributing its travel brochures, Windsor does a small amount of advertising, limited to the journals of its sponsoring organizations and a few general circulation magazines, such as The New Yorker, Town & Country, Architectural Digest, Travel & Leisure, and Millionaire Magazine. Pl. Exhs. 197–209; Tr. 126–27, 167, 408, 427. With the exception of its Around the World tour, Windsor does not usually advertise in any trade magazines or through any trade organizations. Tr. 126–27, 157, 167–69, 355–56, 435–36.

21. Windsor does not market its tours through travel agents, and does not send travel agents any of its brochures. Tr. 167–69, 435–36. In fact, Windsor emphasizes this aspect of its business by telling its customers that there are "no travel agent profits" which would increase the price of the tour and that the "savings are passed along" to them. Tr. 157–59, 162–64.

*The Defendant*

22. ITC was founded in 1985 by Mr. Santo Mistretta, who is presently its president and sole shareholder. Tr. 205.

23. Mr. Mistretta entered the travel field in 1968 when he was hired by AFS International, an organization that conducts intercultural exchange programs for high school students. Tr. 251–52. One of Mr. Mistretta's functions at AFS International was to negotiate with airlines in order to obtain reduced airfares for the students participating in the exchange programs. *Id.*

24. Mr. Mistretta left AFS International in 1982 and started a partnership under the name International Travel Consortium. Mr. Mistretta's concept for his new business was based on his belief that the benefit of the leverage gained by purchasing in volume could be passed along to smaller exchange organizations if they negotiated as a group or "consortium." Thus, his work paralleled the work he performed for AFS International, namely, negotiating with airlines on behalf of a group of smaller non-profit student exchange organizations in order to obtain inexpensive airfares for their students. Tr. 252–53.

25. In 1985, however, International Travel Consortium was dissolved. Tr. 253–54. After its dissolution, Mr. Mistretta formed the defendant company, ITC, which continued the same business as that of International Travel Consortium. *Id.*

26. Since that time, a major part of ITC's business has consisted of negotiating lower airfares for non-profit high school exchange organizations. Tr. 226, 229, 253–55. For example, ITC has negotiated on behalf of organizations such as AFS International, International Christian Youth Exchange (ICYE), Volunteers for Peace, International Summer Stays, American Intercultural Student Exchange, and American Scandinavian Student Exchange. *See* Tr. 229.

27. Eventually, ITC expanded its business to include the designing of customized cultural immersion programs. Tr. 206–07, 249. Typically, these programs have consisted of study abroad programs designed for colleges and universities and are most often in the field of Russian language studies. Tr. 255, 449–50. Pursuant to agreements with Moscow State University and St. Petersburg State University (formerly Leningrad State University), ITC now offers academic programs which it constructs in concert with professors from those institutions. Tr. 450–51, 460.

28. ITC has constructed study abroad language programs for Duke University, the University of Arizona, the University of Miami, Vanderbilt University, Indiana University and The School for International Training. Tr. 459–60. ITC has also constructed Russian Language training programs which enabled cadets from the U.S. Military Academy at West Point and midshipmen from U.S. Naval Academy at Annapolis to attend Russian language classes at Moscow State University. Tr. 460.

29. In the course of developing its language study abroad programs, ITC has acquired an expertise in the Soviet Union and Eastern Europe that includes dealings with not only the more well-known travel bureaus in those areas, but also with various lesser-known agencies. Tr. 257–61. For example, ITC developed relationships with a Soviet travel agency, Sputnik, which was responsible for youth travel in what was formerly the U.S.S.R., and with the Central Council for Tourism and Excursions (CCTE), another Soviet agency that arranged travel for all Soviet citizens. Tr. 258–59.

30. Using this expertise, ITC designs special interest study programs in Eastern Europe and the former Soviet Union to the specifications of special interest groups and, to a lesser extent, for travel agents. Tr. 257–58, 266–67, 460–61. For example, ITC has arranged programs in which American high school and college-level teachers meet with their counterparts in the Soviet Union. ITC has also designed home-stay programs in which American students and teachers live in the homes of Russian citizens for several weeks. Tr. 460–61.

31. ITC has almost no direct contact with the individual program participants. In its air-only services for high school student exchange organizations and university study abroad offices, ITC deals only with the exchange organizations and university study abroad offices. Tr. 262. Although ITC is provided with the names of the high school exchange students so that it can generate the tickets, it delivers the tickets to the exchange organization, and the tickets are handled by a chaperone who accompanies the students to their destination. Tr. 263–64. Furthermore, when ITC designs customized programs to the specifications of its clients—usually language study-abroad programs designed for major universities—it negotiates with the college professors responsible for designing the programs or with the group leaders of the organizations for which ITC is designing the programs. Tr. 268. Similarly, when ITC designs a program at the request of a travel agent, it deals only with the travel agent and never with the travel agent's client. Tr. 267.

32. The size of ITC's trips range from twenty to twenty-five persons, and their prices range from under $1000 to $3500. *See* Pl. Exh. 331, at 62–64.

33. ITC has never been a tour operator, has never conducted tours, and has never marketed its services to individual travelers without an intermediary agent or organization. Tr. 213, 455, 514–15, 206–07, 230, 244, 280–81, 262–64, 458.

34. ITC's advertising is limited. In its seven years of doing business, ITC has run only two advertisements, both of which were directed to the travel industry rather than to the general public: an advertisement in the Travel Agent Personnel Directory, a handbook used by travel agents; in 1989, an advertisement in a one-time Eastern European supplement to Travel Agent Magazine. *See* Pl. Exh. 317; Tr. 271–73; Def. Exhs. JP, JQ; Tr. 274–75. ITC publishes neither a list of its tours nor of their prices. Pl. Exh. 331, at 65.

35. With the exception of ITC's name being listed as "Intravco" in the Travel Agent Personnel Directory, *see* Pl. Exh.

317, ITC's name has always been printed as "Intravco Travel Centers, Inc." accompanied by the company's logo which not only shows its full name, but also emphasizes the initials "ITC." *See* Pl. Exhs. 300, 302, 303, 305–08, 310, 318; Tr. 209–10, 223–25, 231–32, 240, 468–69.

36. The defendant is almost always referred to as "ITC," rather than Intravco or Intravco Travel Centers. Defendant's customers, clients, and the airlines with which it negotiates, refer to defendant as ITC. Tr. 237–38. The name ITC, not Intravco or Intravco Travel Centers, appears on defendant's office door, and the defendant's telephone is answered with the greeting "ITC" or "ITC Travel." Tr. 240. None of the students who participate in the high school exchange or university study abroad programs for which ITC negotiates air fares sees the terms Intravco or Intravco Travel Centers. Tr. 263–65. ITC does not send documents to the passengers on the programs it constructs, and itineraries that ITC may print for an organization or tour organizer are generally not provided to the individual travelers. Tr. 270, 278–79; Pl. Exhs. 312–14. Furthermore, all the travel documents issued by ITC contain the company's full name and logo as discussed above.

37. During the six years in which Windsor and ITC concurrently operated their respective businesses, there has been only one occurrence of actual confusion, where a German supplier of travel services presented a bill to Windsor for services that it had provided to ITC. Tr. 120–21.

### DISCUSSION

#### A. *Jurisdiction*

The court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

#### B. *Federal Trademark and Unfair Competition*

■ The purpose of trademark law is to protect three different interests: (1) the trademark owner's interest in not having the good reputation associated with its

mark from being tarnished by inferior merchandise of another user, (2) the owner's interest in being able to enter a related field at some future time, and (3) the public's interest in not being misled by confusingly similar marks. *Scarves By Vera, Inc. v. Todo Imports, Ltd.* 544 F.2d 1167, 1172 (2d Cir.1976). Thus, the Lanham Act prohibits the unauthorized use of "any ... colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). The Act also forbids the use of

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities.

15 U.S.C. § 1125(a).

 The main issue to be resolved in any trademark dispute, therefore, is whether the use of the defendant's trade name is likely to confuse an appreciable number of ordinary prudent purchasers as to the source of the product or service in question.[2] *Western Pub. Co. v. Rose Art Industries, Inc.*, 910 F.2d 57, 59 (2d Cir.1990); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985). Whether there is such a likelihood of confusion is determined by balancing the following factors: (1) the strength of plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products (or services); (4) the likelihood that the

prior owner will bridge the gap; (5) actual confusion; (6) defendant's good or bad faith in adopting its mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.[3] *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see also Western Pub.*, 910 F.2d at 60–61; *Mobile Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir.1987). This list of factors is not exclusive, and no single factor is determinative. *Polaroid*, 287 F.2d at 495.

**(1) Strength of Plaintiff's Mark**

 The "strength" of a mark refers to its distinctiveness—i.e., its tendency to identify goods or services sold under the mark as emanating from a particular source, even when the source is unknown to the consumer. *McGregor–Doniger*, 599 F.2d at 1131. Although a registered mark is presumptively distinctive, *id.* at 1132, its registration does not necessarily mean the mark is strong. *See Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1555 (S.D.N.Y.1987).

 The strength of a mark is measured by two factors: (1) its position on the spectrum of marks; and (2) its marketplace recognition value. *Id.* at 1554. The first factor refers to the mark's inherent potential at the time of its first use, whereas the second factor identifies actual consumer recognition—at the time of litigation—that the mark is associated with the particular goods or services in question. *See id.*

 For the purpose of determining the mark's inherent potential, the spectrum of marks is divided into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d

---

**2.** The "likelihood of confusion" standard governs both trademark infringement and unfair competition claims brought under the Lanham Act. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir.1987).

**3.** Although the *Polaroid* factors were originally intended to apply to non-competing products, *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d

1126, 1139 (2d Cir.1979), subsequent case law makes it clear that these factors apply to competing products as well. *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 214 (2d Cir.1985); *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 378 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986).

251, 256 (2d Cir.1982); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976). A generic term "refers ... to the genus of which the particular product is a species," e.g., "Encyclopedia," and is not entitled to trademark registration or legal protection. *Abercrombie & Fitch*, 537 F.2d at 9. A descriptive mark is one which " 'conveys an immediate idea of the ingredients, qualities or characteristics of the goods,' " e.g., "World Book" for an encyclopedia. *Edison Bros.*, 651 F.Supp. at 1554 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Descriptive marks are considered inherently weak, and thus, may be registered or protected only upon a showing of "secondary meaning," i.e., that the mark is the source of the product or service in question. *McGregor–Doniger*, 599 F.2d at 1140. A suggestive mark is one that " 'require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods,' " e.g., "Coppertone" for suntan oil. *Edison Bros.*, 651 F.Supp. at 1554 (quoting *Stix Products*, 295 F.Supp. at 488). An arbitrary or fanciful mark is one that has no association with the particular product or service, e.g., "Kodak" for photographic equipment. *Abercrombie & Fitch*, 537 F.2d at 11. Marks which fall into these last two categories may be registered and protected without proof of secondary meaning. *Id.*

Applying the above definitions to the mark INTRAV, the court concludes that it falls into the "suggestive" category on the trademark spectrum because it does not exist in any dictionary, is not used in ordinary speech, and gives some indication that it is related to travel products or services. Furthermore, the decision of the Patent and Trademark Office to register INTRAV without requiring proof of secondary meaning creates a rebuttable presumption that the mark is suggestive or arbitrary and fanciful, rather than merely descriptive. *Abercrombie & Fitch*, 537 F.2d at 11. The owner of a presumptively distinctive mark "need not introduce evidence of secondary meaning in order to gain protection for its mark." *McGregor–Doniger*, 599 F.2d at 1132.

However, in evaluating the strength of the mark, the court must consider not only its conceptual strength as described above, but also its commercial strength—i.e., its significance in the marketplace as identifying the origin of goods. *Edison Bros.*, 651 F.Supp. at 1555. Thus, although a suggestive mark can have "strength" without proof of secondary meaning, the absence of such evidence can be considered as a factor weighing against a finding of likelihood of confusion. *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 968 (2d Cir.1981). Furthermore, the strength of a mark can be undermined by third party uses of similar marks. *Western Pub.*, 910 F.2d at 61; *Lever Bros.*, 693 F.2d at 256; *Edison Bros.*, 651 F.Supp. at 1555.

Here, no evidence was introduced by Windsor to demonstrate consumer recognition of the INTRAV mark. Furthermore, Windsor's advertising is mainly in journals published by its sponsoring organizations, with a few advertisements placed in a small number of general circulation magazines. Although Windsor mails brochures displaying the INTRAV mark to a large number of individuals each year, these brochures are mailed to substantially the same individuals year after year, and do not, in and of themselves, establish that the mark is strong. Furthermore, several other companies in the travel business use names similar to INTRAV, e.g., In Travel Agency, Inc., Intertrav, Intra Travel, and Travcoa. Def. Exh. LF; Tr. 515–19. In fact, the tours prepared and sold by Travcoa appear quite similar to those sold by INTRAV. Def. Exhs. LF, LQ, LS–LX; Tr. 515–19. Although Windsor's mark is a suggestive one, and is therefore presumptively strong, the absence of proof of secondary meaning and the existence of other travel companies with similar names compels the court to conclude that Windsor's mark is not actually strong.

### (2) *Similarity of the Marks*

In determining the degree of similarity between the marks in question, the

court must focus on "the general impression conveyed by the two marks," including "all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers." *McGregor–Doniger Inc.*, 599 F.2d at 1133–34; *Lever Bros. Co.*, 693 F.2d at 257 (even close similarity between the two marks is not dispositive). Furthermore, if the marks are found to be similar, their similarity is relevant only insofar as it confuses prospective purchasers as to the source of the product or service in question. *Id.*

■■■ Windsor argues that defendant's name should be analyzed by looking only at the first word—Intravco—instead of defendant's full name—Intravco Travel Centers. *See* Plaintiff's Post Trial Memorandum of Law ("Pl. Post Trial Mem.") at 16. While it is true that defendant's name has appeared on one occasion in a travel agent's directory as the shortened form, Intravco, *see* Pl. Exh. 317, all its other advertisements and documents used in its day-to-day business prominently display defendant's logo showing not only its full name, but also emphasizing the initials "ITC." Indeed, the defendant is generally referred to as "ITC," rather than Intravco or Intravco Travel Centers: defendant's clients and the airlines it uses refer to it as "ITC," "ITC" appears on defendant's office door, and the defendant answers its telephone with a greeting using "ITC." The court, therefore, disagrees with plaintiff that defendant's name is in fact Intravco rather than Intravco Travel Centers or ITC.

In addition, none of the students who participate in the high school exchange programs or university study abroad programs for which ITC negotiates air fares sees the terms Intravco or Intravco Travel Centers. ITC does not send documents to the passengers on the programs it constructs, and itineraries that ITC may print for an organization or tour organizer are generally not provided to the individual travelers. The court, concludes, therefore, that although there is some similarity between plaintiff's mark and defendant's name, they are not similar enough—when compared in their entireties and in the context of how they are used—to create a likelihood of confusion for prospective purchasers.

### (3) *Proximity of the Services*

■■■ The proximity of plaintiff's and defendant's services is another factor relevant to whether consumers will be likely to be confused about the sources of their services. *Edison Bros.*, 651 F.Supp. at 1556. In assessing this factor, the court considers not only the nature of the services themselves, but also the structure of the relevant market in which they are sold, which includes the manner in which the services are displayed and advertised, the channels of trade through which they are promoted, and the class of customers for whom they are designed and to whom they are sold. *Vitarroz Corp.*, 644 F.2d at 967; *Edison Bros.*, 651 F.Supp. at 1557.

■■■ Here, although the parties are both engaged in the travel business, their services are quite different from one another. The companies have entirely different characters and market their services to different classes of customers through different channels of trade. Windsor is a tour operator of pre-packaged tours, whereas ITC merely designs tours according to the particular specifications of its clients. There is no evidence of even an overlap between the two companies' businesses: ITC does not design, market, or conduct any pre-packaged tours, and Windsor does not negotiate reduced price airfares for exchange organizations or design cultural immersion study programs according to individual specifications.

Furthermore, the parties market their services to entirely different classes of purchasers. Windsor sells its services to individuals, namely the tour participants themselves, while ITC deals only with exchange organizations, university study abroad offices, group leaders, and travel agents. In addition, Windsor's clientele consists of persons who, on average, are sixty-five years old and who are affluent enough to be able to afford tours of at least $2,300, whereas the majority of ITC's travelers are high school, college, and graduate students.

The channels of trade through which the parties' services are marketed are also different. Windsor markets both its Deluxe Adventure and Adventure Holidays tours directly to the individual passengers, while ITC corresponds only with the affiliating organizations or travel agents. Furthermore, Windsor advertises in general circulation media but not in trade magazines, whereas ITC advertises in trade publications but not to the general public.

The court concludes, therefore, that although both Windsor and ITC are in the travel business, their services are quite different from one another in terms of the nature of the services they provide, their respective classes of customers, and the channels of trade through which they market themselves.

### (4) Bridging the Gap

■ The term "bridging the gap" is used to describe the senior user's interest in preserving avenues of expansion into the defendant's field under its own trademark. *Polaroid*, 287 F.2d at 495; *Inc. Pub. Corp. v. Manhattan Magazine*, 616 F.Supp. 370, 385 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986); *Edison Bros.*, 651 F.Supp. at 1558. This factor militates in favor of finding a likelihood of confusion if the senior user of a trademark proves an intent to expand its past activities in order to enter a related field occupied by the junior user. *Inc. Pub. Corp.*, 616 F.Supp. at 385.

Here, there is no evidence that Windsor intends to expand its business into ITC's field of expertise. Windsor does no business of any kind which involves high school exchange or study abroad programs and does not intend to do so in the future; Windsor does not sell airline ticketing services and there is no evidence that it will ever expand into that field; and Windsor has never arranged a home-stay program and does not anticipate ever offering programs that include home-stays. Tr. 180–82.

■ Windsor argues that if any gap existed between plaintiff's and defendant's services, its Conference Planners International division bridged that gap. The evidence shows, however, that Conference Planners International was structured in order to "slightly adjust" Windsor's pre-packaged tours to coincide with an organization's upcoming international conference. Tr. 71. Furthermore, the division, which was established only in 1989, is no longer doing business and, as the President of Intrav testified, Windsor does not intend to reenter that aspect of the travel industry. Tr. 72, 177–80. Thus, although Windsor might customize a pre-existing packaged tour by making a small change in its itinerary, it does not perform the service provided by ITC of constructing or designing entire itineraries according to a customer's individual specifications. Tr. 172–77.

The court concludes, therefore, that in over twenty-five years of doing business, Windsor has not manifested any intention of expanding into ITC's business. Consequently, its failure to prove any intention of bridging the gap between the parties' two segments of the travel industry militates against a likelihood of confusion.

### (5) Actual Confusion

■ Although no evidence of actual confusion is necessary to prove a likelihood of confusion, the court may infer from the lack of such evidence that consumer confusion is unlikely to occur. *McGregor–Doniger Inc.*, 599 F.2d at 1136 (citation omitted); *see also Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 (2d Cir.1983) (no confusion during three years of concurrent use, during which substantial sales occurred, was strong indicator that likelihood of confusion is minimal). If both parties have had a significant volume of sales over a long period of time, even "isolated instances of actual confusion may be disregarded as *de minimus.*" *Inc. Pub. Corp.*, 616 F.Supp. at 386 (citation omitted). Furthermore, because the Lanham Act is concerned with confusion among consumers, plaintiff must prove that an appreciable number of reasonable consumers—rather than suppliers or retailers—would be confused as to the source of defendant's services. *Edison Bros.*, 651 F.Supp. at 1558.

■ Generally, a plaintiff charging infringement attempts to prove actual confu-

sion through market surveys reflecting consumer confusion and through anecdotal evidence of consumer confusion. *Id.* Here, Windsor offers no market surveys, and anecdotal evidence of only one incident in which a German supplier of travel services presented a bill to Windsor for services that it had provided to ITC. Tr. 120–21. However, no testimony was elicited from any witness with personal knowledge of the incident as to the reason the bill was sent to the wrong company. Tr. 121. Moreover, assuming arguendo that this incident proves actual confusion between the plaintiff and the defendant, it involved confusion of a another supplier within the travel industry rather than of a consumer who purchases the services in question.

In light of the significant volume of sales during the six years that plaintiff and defendant concurrently operated their respective businesses, this one isolated incident of confusion cited by Windsor is *de minimus,* and therefore, does not establish actual confusion.

### (6) *Defendant's Good or Bad Faith*

■■■■ The issue of defendant's bad faith in using plaintiff's mark depends on whether the defendant adopted its mark or trade name with the intention of capitalizing on any confusion between plaintiff's and defendant's products or services so as to unjustly benefit from plaintiff's reputation and good will. *See McGregor–Doniger,* 599 F.2d at 1137; *Edison Bros.,* 651 F.Supp. at 1560. The fact that a defendant had constructive notice of plaintiff's trademark through its registration and use is not necessarily evidence of a defendant's bad faith. *McGregor–Doniger,* 599 F.2d at 1137; *Edison Bros.,* 651 F.Supp. at 1560.

■■■■ Plaintiff argues that defendant's bad faith is established by the fact that ITC's founder, Mr. Mistretta, recalls having seen an INTRAV brochure that was sent to his wife many years before he selected Intravco as part of his new company's name. Pl. Post Trial Mem. of Law. at 32; Tr. 248–49. Although Mr. Mistretta perused the brochure as a matter of general interest, he testified that at the time he chose the name for his new company, plain-

tiff's mark did not occur to him and was in no way the inspiration for the name Intravco Travel Centers. Tr. 249, 254. Although Mr. Mistretta admits that he saw the INTRAV mark before starting the defendant company, the court credits his testimony that he did not think of INTRAV when he chose his company's new name. Furthermore, the court also finds credible Mr. Mistretta's testimony as to why and how he invented the name Intravco Travel Centers, Inc—he wanted a name that would draw on the good will of his first company, International Travel Consortium. Tr. 253. Mr. Mistretta simply took the first syllable of the three words, *In* ternational, *Trav* el, and *Co* nsortium, and constructed the word Intravco. Tr. 253–54. Furthermore, the fact that Mr. Mistretta's own office has always used and promoted the abbreviation ITC instead of Intravco is further evidence of defendant's innocent intent.

The court concludes that in light of Mr. Mistretta's explanation as to how he chose his company's trade name, the fact that he saw plaintiff's mark one time several years before starting his business does not establish that he chose the name Intravco Travel Centers in bad faith with the intent to appropriate the good will of INTRAV.

### (7) *Quality of Defendant's Services*

The operation of this factor within the *Polaroid* formula for finding a likelihood of confusion is itself the subject of some confusion. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir.1988). One view is that if the junior user's product is inferior, then the senior user's reputation will be injured insofar as consumers might think that the source of the inferior product is the senior user. *Id.* (citation omitted). The other view, however, is that if the junior user's product or service is of equal quality to that of the senior user, then the senior user will be injured because of the increased likelihood of consumer confusion between products of such similar quality. *Id.* (citations omitted).

Even though this circuit has not adopted either view, *see id.,* this factor neither adds to nor detracts from the analysis required in this particular case. Defendant's servic-

es are not inferior to those of plaintiffs—they are merely different. Windsor houses its tour participants in five-star hotels and transports them in Mercedes–Benz motorcoaches, whereas most of ITC's travelers stay in university dormitories or with families in private homes based on their desire for full cultural immersion. One is not inferior or superior to the other, but merely attracts a different clientele and serves different purposes within the world of travel.

### (8) *Sophistication of the Consumers*

The final *Polaroid* factor, the sophistication of the consumers, is grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion. *Hasbro*, 858 F.2d at 78–79; *McGregor–Doniger*, 599 F.2d at 1137. Consumer sophistication is reflected by the amount of attention buyers give to their choices when purchasing the class of goods or services in question. *See McGregor–Doniger*, 599 F.2d at 1137 (average purchaser of an automobile will devote more attention to examining different products and determining their manufacturer or source than will average purchaser of a ball of twine). High levels of consumer sophistication militate against the likelihood of confusion in the marketplace, *Inc. Pub.*, 616 F.Supp. at 396, and the higher the price of an article, the more careful the typical consumer can be expected to be. *Edison Bros.*, 651 F.Supp. at 1561.

Here, the plaintiff sells relatively expensive tours—ranging from $4,600 to $48,800—to consumers who, on average, are affluent and well-educated. Defendant, however, sells its services primarily to travel professionals, e.g., directors of student exchange organizations, travel agents, and group leaders of private organizations. Thus, the court concludes that both plaintiff and defendant sell their services to consumers who are quite sophisticated with regard to the aspects of travel in which each company specializes.

In sum, after balancing all the *Polaroid* factors, the court concludes that Windsor has not successfully demonstrated that defendant's use of its own trade name has created a likelihood of confusion among the consumers who purchase the respective services of two companies. First, although Windsor's mark is conceptually strong in that it is suggestive, it is not commercially strong insofar as consumers associate INTRAV with travel tours. Second, the parties' respective businesses occupy different segments of the travel industry, and the similarity between plaintiff's mark and defendant's trade name is not so great as to cause a likelihood of confusion between the two. In addition, there is no indication that Windsor intends to enter defendant's area of the travel field. Finally, there is no probative evidence of actual confusion or defendant's bad faith. The court holds, therefore, that there is no likelihood of confusion as to the source of plaintiff's or defendant's services based on defendant's use of its trade name. Accordingly, plaintiff's request for injunctive relief pursuant to the Lanham Act is denied.

### C. *Common Law Trademark and Unfair Competition*

The likelihood of confusion test applies equally to federal and state common law claims. Proof of likelihood of confusion as to source of the goods or services is essential to prevail on either the common law claim of trademark infringement or unfair competition. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983). In addition to likelihood of confusion, plaintiff must prove that the defendant used its mark in bad faith. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Since Windsor has failed to prove a likelihood of confusion or any bad faith on the part of defendant, the relief requested for the common law infringement and unfair competition claims is similarly denied.

### D. *State Dilution*

In addition to its federal and common law claims, plaintiff asserts a cause of action under New York's anti-dilution statute, which seeks to prevent injury to business reputation or the dilution

of the distinctive quality of a mark. The statute provides that

> [l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1984).

The anti-dilution statute was originally intended to prevent unauthorized use of a name or mark which is identical to the established mark. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1028–30 (2d Cir.1989). Thus, in order for a plaintiff to prevail, the marks in question must be "very" or "substantially" similar. *Id.* at 1028–30 (no substantial similarity between the marks "LEXIS" and "LEXUS"). Furthermore, plaintiff must also establish that its mark possesses a distinctive quality capable of dilution, *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977), and that there is a likelihood of dilution. *Sally Gee,* 699 F.2d at 625. Thus, "distinctiveness for dilution purposes is equivalent to the strength of a mark for infringement purposes," and a likelihood of dilution requires some mental association between plaintiff's and defendant's marks. *Mead Data,* 875 F.2d at 1030–31.

Here, the mark INTRAV and the name Intravco Travel Centers are not substantially similar enough to support a claim for dilution. In addition, given the fact that there are other tour companies with names similar to INTRAV, the plaintiff's mark does not possess the distinctiveness required under the statute. Finally, there has been no evidence that plaintiff's mark will be likely to be diluted by defendant's use of its own trade name. Accordingly, the plaintiff's request for injunctive relief under New York's anti-dilution statute is denied.

### E. *Attorney's Fees*

■ Defendant requests that the court award it attorney's fees, pursuant to either 15 U.S.C. § 1117 or Rule 11 of the Fed. R.Civ.Proc., on the grounds that plaintiff brought this case without an adequate investigation of the merits of the claim.

The last sentence of 15 U.S.C. § 1117 provides that "[t]he court in exceptional circumstances may award reasonable attorney's fees to the prevailing party." The phrase "exceptional circumstances" includes cases that were brought without an adequate investigation of the merits of the claim. *Universal City Studios Inc. v. Nintendo Co. Ltd.,* 797 F.2d 70, 77 (2d Cir.1986), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Viola Sportswear, Inc. v. Mimun,* 574 F.Supp. 619, 620–21 (E.D.N.Y.1983); *Mennen Co. v. Gillette Co.,* 565 F.Supp. 648, 657 (S.D.N.Y. 1983), *aff'd,* 742 F.2d 1437 (2d Cir.1984).

Rule 11 of the Fed.R.Civ.Proc. provides that "[t]he signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other papers; that to the best of his knowledge, information, and belief formed after reasonable inquiry[,] it is well grounded in fact ... and that it is not interposed ... to harass...." To remedy a Rule 11 violation, the court may award sanctions, including reasonable attorney's fees.

Here, the court finds that although the passages of the trial transcript cited by defendant show a misunderstanding by the plaintiff as to the nature of defendant's business, the evidence does not establish that the plaintiff failed to investigate the merits of its claim or that its attorneys failed to make a reasonable inquiry into whether the claim was well-grounded in fact. On the contrary, all the claims raised by plaintiff involved genuine issues of fact that could not have been resolved without a trial. Accordingly, defendant's request for attorney's fees is denied.

### CONCLUSION

For the reasons set forth above, the court finds that defendant has not infringed or diluted plaintiff's trademark and has

not engaged in unfair competition. The relief requested by plaintiff is therefore denied, and accordingly, the complaint is dismissed. The court also denies defendant's request for attorney's fees.

So Ordered.